**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 2 4 2011

JAMES W. McCORMACK CLERK
By:_____ DEP CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS

DAVID J. SACHAR, and CHRISTINE ⟩
M. SACHAR, as individuals and on ⟩
behalf of all others similarly situated, ⟩       **CIVIL ACTION NO.** 4 · 11 - C V - 0 266 BSM
                                        ⟩
            Plaintiffs,                 ⟩       State Case No. 60 cv 2011 0770
                                        ⟩
v.                                      ⟩
                                        ⟩       This case assigned to District Judge _Miller_
IBERIABANK CORPORATION,                 ⟩       and to Magistrate Judge_____Young_
                                        ⟩
            Defendant                   ⟩

### NOTICE OF REMOVAL

Jack Wagoner                            Brent Walker
Wagoner Law Firm, P.A.                  Carter Walker, PLLC
1320 Brookwood, Suite E                 P.O. Box 629
Little Rock, Arkansas 72202             Cabot, Arkansas 72023
Jack@wagonerlawfirm.com                 bwalker@carterwalkerlaw.com

Steven A. Owings                        Larry Crane
Owings Law Firm                         Pulaski County Circuit Clerk
1400 Brookwood                          401 West Markham Street
Little Rock, Arkansas 72202             Little Rock, Arkansas  72201
sowings@owingslawfirm.com

PLEASE TAKE NOTICE that Defendant IBERIABANK Corporation ("IBERIABANK

Corp.") hereby removes this action pursuant to 28 U.S.C. §§ 1331, 1332, 1441, and 1446 from

the Circuit Court in and for Pulaski County, Arkansas to the United States District Court for the

Eastern District of Arkansas. The grounds for removal are set forth below.

1.      On or about February 18, 2011, Plaintiffs, David J. Sachar and Christine M.

Sachar (the "Sachars") commenced this action by filing a Summons and Class Action Complaint

in the Circuit Court in and for Pulaski County, Arkansas captioned *David J. Sachar and*

*Christine M. Sachar, as individuals and on behalf of all others similarly situated v.*

*IBERIABANK Corporation*, Case No. 60 CV 2011 0770.

2.     IBERIABANK Corp. was served with the Summons and Complaint in this action on February 22, 2011 via personal service on its registered agent.

3.     This Notice of Removal is timely because it is filed within thirty days of service on IBERIABANK Corp. of the Summons and Complaint. *See* 28 U.S.C. § 1446(b).

4.     As required by 28 U.S.C. § 1446(a), attached as Exhibit A are copies of all process, pleadings, orders, and other papers or exhibits filed in the state court.

5.     Venue of this removal is proper in the Eastern District of Arkansas under 28 U.S.C. § 1441(a) because the Circuit Court in and for Pulaski County, Arkansas is within the Eastern District.

6.     Pursuant to 28 U.S.C. § 1446(d), written notice of the removal of this action will be promptly served upon Plaintiffs' counsel, and a Notice of Filing Notice of Removal is being filed with the Clerk of the Circuit Court in and for Pulaski County, Arkansas. A true and correct copy of this Notice of Filing Notice of Removal is attached hereto as Exhibit B.

## PLAINTIFFS' COMPLAINT

7.     The Sachars allege that they are residents of Arkansas. *See* Compl. ¶ 16.

8.     Defendant, IBERIABANK Corp. is a Louisiana corporation with its headquarters and principal place of business in Louisiana. *See* Declaration of Don P. Ledet, executed March 23, 2011 (the "Ledet Decl."), at ¶ 7, which is attached as Exhibit C to this Notice of Removal.

9.     The Sachars' claims involve IBERIABANK Corp.'s resequencing of transactions in its customers' accounts in high-to-low order, and the consequent overdraft fees. *See* Compl. at ¶¶ 2-13.

10.     The Complaint alleges that the practice of resequencing transactions "is designed to increase the number of overdraft fees ("NSF fees") charged to customers who mistakenly overdraw their checking accounts." *Id.* at ¶¶ 3, 14.

2

11.     The Complaint further alleges that IBERIABANK Corp. does not disclose to its customers that it resequences transactions in the posting process. *Id.* at ¶ 35.

12.     Accordingly, the Sachars allege that IBERIABANK Corp.'s resequencing of transactions is an unfair and deceptive business practice. *Id.* at ¶ 13.

13.     The Sachars assert claims sounding in violations of the Arkansas Deceptive Trade Practices Act (Count I), Breach of Contract (Count II), Unjust Enrichment (Count III), Conversion (Count IV), and Injunctive Relief (Count V). *See id.* at ¶¶ 112-152.

14.     The Sachars seeks a money judgment against IBERIABANK Corp. "for actual and compensatory damages," *id.* at Prayer for Relief ¶ C; "interest on damages, litigation costs and attorneys' fees," *id.*; and "injunctive relief," *id.* at Prayer for Relief ¶ B.

15.     The Complaint does not state an amount in controversy.

16.     The Sachars seek to litigate their claims on behalf of themselves and a proposed class as follows:

> **The Class:** All Iberia customers who maintained checking accounts with an Arkansas branch office at any point between January 31, 2007 and the time of trial who incurred one or more overdraft fees as a result of Iberia's practice of resequencing checking account transactions from highest to lowest.

*Id.* at ¶ 92.

17.     As explained below, this Court has jurisdiction over the Sachars' action based on diversity jurisdiction under the Class Action Fairness Act of 2005, Pub L. 109-2, 119 Stat. 4 (2005) ("CAFA"), codified in various sections of Title 28 of the United States Code including 28 U.S.C. §§ 1332(d) & 1453, and federal question jurisdiction based on numerous grounds. Accordingly this action is properly removed to this Court.

## BASIS OF FEDERAL DIVERSITY JURISDICTION
## UNDER CLASS ACTION FAIRNESS ACT ("CAFA")

18.     This action is removable to this Court because federal diversity jurisdiction, 28 U.S.C. § 1332, exists over the Sachars' claims pursuant to CAFA.

3

18437866.2

19.     CAFA became effective on February 18, 2005, and applies to any civil action on or after that date.  CAFA applies to this action because it was commenced on or about February 18, 2011.

20.     Congress enacted CAFA to enlarge federal jurisdiction over proposed class actions.  CAFA provides that a class action against a non-governmental entity may be removed to federal court if: (a) the number of proposed class members is not less than 100; (b) any member of the proposed class is a citizen of a state different from any defendant; and (c) the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.  *See* 28 U.S.C. §§ 1332(d)(2), 1332(d)(5) & 1453(b).  As set forth below, all of the requirements for removal are satisfied.

**Class Size**

21.     CAFA's first requirement, that the proposed class contain at least 100 members, 28 U.S.C. § 1332 (d)(5), is satisfied.

22.     The Sachars' proposed class contains "all Iberia customers who maintained checking accounts with an Arkansas branch office at any point between January 31, 2007 and the time of trial who incurred one or more overdraft fees as a result of Iberia's practice of resequencing checking account transactions from highest to lowest."  *See* Compl. ¶ 92.

23.     The Sachars allege that "[t]he proposed Class is composed of *thousands* of Arkansas Iberia account holders."  *Id.* at ¶ 94. (emphasis added).

24.     The proposed class therefore contains at least 100 members.

**Minimal Diversity of Citizenship**

25.     CAFA's second requirement, that any one member of the proposed class be a citizen of a state different from any defendant, 28 U.S.C. § 1332(d)(2), is satisfied.

26.     The Sachars allege that they are citizens of Arkansas.  *See* Compl. ¶ 16.

4

27.     The Sachars allege that IBERIABANK Corp. is a "foreign for profit corporation." *See id.* at ¶ 17.  IBERIABANK Corp. is a Louisiana corporation.  Ledet Decl. at ¶ 7.  Diversity of citizenship therefore exists between at least one proposed class member and any defendant, satisfying 28 U.S.C. § 1332(d)(2).

28.     The complete diversity of citizenship between the Sachars and IBERIABANK Corp. satisfies CAFA's minimal diversity-of-citizenship requirement and precludes application of the "local controversy" or "home state" exceptions of 28 U.S.C. §§ 1332(d)(3) and (d)(4).

### Amount in Controversy

29.     CAFA's third requirement, that the aggregate amount in controversy exceed $5 million exclusive of interest and costs, 28 U.S.C. § 1332(d)(2), is satisfied.  Although IBERIABANK Corp. disputes liability and damages, the Sachars' claims for relief on behalf of themselves and their proposed class, if granted, would exceed $5 million. *Bell v. The Hershey Co.,* 557 F.3d 953, 957 (8th Cir. 2009) ("When the complaint does not specify an amount in controversy or it is 'unclear or ambiguous' from the face of the complaint whether the jurisdictional threshold is met, the removing defendant must establish the jurisdictional facts by a preponderance of the evidence."); *Roe v. Michelin N. Am., Inc.,* 613 F.3d 1058, 1061 (11th Cir. 2010) ("If a plaintiff makes an unspecified demand for damages in state court, a removing defendant must prove by a preponderance of the evidence that the amount in controversy more likely than not exceeds the . . . jurisdictional requirement."  (ellipsis in original) (internal quotation marks and citation omitted)).[1]

---

[1] Contemporaneously with this Notice of Removal, IBERIABANK Corp. is moving for a stay of all proceedings pending a decision by the United States Judicial Panel on Multidistrict Litigation (the "JPML") of the transfer of this case to *In re: Checking Account Overdraft Litigation,* 09-md-2036, pending before the Honorable James Lawrence King of the United States District Court for the Southern District of Florida (a/k/a "MDL 2036").  Accordingly under the precedent from the JPML in MDL 2036, the Sachars "can present their jurisdictional objections to the transferee court." *See* Transfer Order, MDL No. 2036 (J.P.M.L. November 30, 2010), Case No. 1:10-cv-24331-JLK (S.D. Fla. Dec. 6, 2010) (quoting *In re ClassicStar Mare Lease Litig.,* 528 F.Supp.2d 1345, 1347 (J.P.M.L. 2007).  Thus, once this case is

5

30.   The Sachars seek actual and compensatory damages, litigation costs, attorney's fees, and injunctive relief. *See* Compl. ¶¶ 119-120, 126-127, 134, 147, 152, Prayer for Relief B-C.

31.   In connection with this Notice of Removal, Don P. Ledet, IBERIABANK Corp.'s Executive Vice President and the Director of Deposit Products and Retail Support, reviewed and analyzed the total amount of non-sufficient funds charges (a/k/a "Overdraft Charges") that IBERIABANK Corp. subsidiaries collected from Arkansas customers from the period of January 2007 through the end of 2010.

32.   As set forth further in the Ledet Declaration, IBERIABANK Corp. has acquired and/or assumed the assets and deposits of several banks in Arkansas since 2007—PBT, FCB and ANB.

33.   However, for the limited purpose of establishing the amount in controversy for this Notice of Removal, Mr. Ledet only reviewed and analyzed data relating to Overdraft Charges charged to Arkansas customers once that bank became part of the IBERIABANK Corp. family.

34.   IBERIABANK Corp., through its subsidiaries in Arkansas, received a total of $20,371,694.06 in net revenue from Overdraft Charges from the beginning of 2007 through the end of 2010.

35.   The Sachars' Complaint alleges that "Iberia engaged in a practice of resequencing transactions in its customers' accounts in high-to-low order — posting the largest transactions first and the smallest transactions last." Complaint, ¶ 2.

---

transferred to the Southern District of Florida, Judge King will be free to—and perhaps required to—apply 11th Circuit precedent in deciding the case. *Lanfear v. Home Depot, Inc.,* 536 F.3d 1217, 1223 (11th Cir. 2008) ("A transferee court is not required to apply the law of the transferor court when, as here, the transferee court interprets federal law.").

36.    The Sachars' Complaint further describes five transactions the Plaintiffs engaged in between May 29, 2010 and June 1, 2010 and alleged that IBERIABANK Corp. "ranking the transactions from highest to lowest results in five $30 overdraft fees."   Complaint, ¶ 80. Plaintiffs are thus alleging that they were charged $150 in Overdraft Charges for these five transactions.

37.    The Sachars' Complaint further alleges that "Iberia's high-to-low posting scheme caused the Sachars in excess of $120 in excess overdraft fees-on the one occasion noted alone." Complaint, ¶ 82.

38.    In other words, the Sachars allege that had IBERIABANK posted transactions in low-to-high order, Overdraft Charges would have been reduced by 80 percent.

39.    The Sachars' Complaint further alleges that the Sachars' "claims are typical of the claims of other members of the proposed Class."   Complaint, ¶ 102.   Though IBERIABANK Corp. disputes any and all liability for the claims alleged in the Complaint, and is confident that its application of overdraft charges on a high-to-low basis has been in the best interest of its customers, based on the *Plaintiffs' own* allegations and the NSF data collected by IBERIABANK Corp. for Arkansas accounts, the amount in controversy in this action exceeds $5 million. Specifically, accepting—for the limited purpose of establishing the amount in controversy for this notice of removal—IBERIABANK Corp.'s proffer that 80 percent of the Overdraft Charges that IBERIABANK*fsb*, its operating subsidiary in Arkansas during the relevant time period, collected from its Arkansas customers improperly assessed, at least $16,297,355.01 is in controversy.  Ledet Decl. ¶ 34.

40.    This figure represents 80 percent of the Overdraft Charges that IBERIABANK Corp. collected from its customers with accounts based in Arkansas from 2007 through 2010. *Id.*

41.    The Sachars allege that IBERIABANK Corp.'s overdraft fees ranged from approximately $22.50 to $30 per transaction during the relevant time period. *See* Compl. at ¶ 38.

7

42.     Though the Sachars do not specify the amount in controversy, they cite to other overdraft charge class actions related to high-to-low posting that resulted in damages of $203 million and $410 million, which is far in excess of the $5 million threshold under CAFA. *See id.* at ¶ 41.

43.     The Sachars' requested injunctive relief, if awarded, would add significant further sums to the amount in controversy in terms of the value of such relief to the putative class members. *Usery v. Anadarko Petroleum Corp.*, 606 F.3d 1017, 1018 (8th Cir. 2010) ("In a suit for declaratory or injunctive relief the amount in controversy is the value to the plaintiff of the right that is in issue."); *Federated Mut. Ins. Co. v. McKinnon Motors, LLC*, 329 F.3d 805, 807 (11th Cir. 2003) ("When a plaintiff seeks injunctive or declaratory relief, the amount in controversy is the monetary value of the object of the litigation from the plaintiff's perspective.") (citation omitted).

44.     The Sachars' request for attorney's fees, if awarded, would also add significant further sums to the amount in controversy. *See Thomas v. S. Pioneer Life Ins. Co.*, No. 3:09CV00120-WRW, 2009 WL 4894695, *2 (E.D. Ark. Dec. 11, 2009) ("when determining the amount in controversy in CAFA cases ... statutory attorneys' fees may be counted.")

45.     Therefore, the preponderance of the evidence establishes that the Sachars have alleged a class-wide aggregate amount in controversy that easily exceeds $5 million.

## FEDERAL QUESTION REMOVAL

46.     In addition to being removable based on diversity jurisdiction under CAFA, this case is also removable under federal question jurisdiction because the Sachars' Complaint implicates several substantial issues of federal law.

47.     Under Article III of the Constitution, the power of the judiciary extends "to all Cases, in Law and Equity, arising under this Constitution, [and] the Laws of the United States... ." U.S. Const. art. III, § 2, cl. 1.  Congress first conferred federal question jurisdiction on lower

federal courts in the Judiciary Act of 1875. The current successor to that Act is found at 28 U.S.C. § 1331, which bestows on district courts "original jurisdiction of all civil actions arising under the constitution, laws, or treaties of the United States." § 1331. Under 28 U.S.C. § 1441(a), a defendant may remove any case over which the district court would have had original jurisdiction.

48.     In *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180 (1921), the Supreme Court concluded that, under the forerunner of § 1331, "arising under" jurisdiction existed over causes of action created by state law where "the right to relief depends upon the construction or application of the constitution or the laws of the United States, and ... such federal claim is not merely colorable, and rests upon a reasonable foundation." *Id.* at 199.

49.     Although some of the Supreme Court's intervening decisions, such as *Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804 (1986), suggested an abrogation of the rule set forth in *Smith*, the Supreme Court reaffirmed the vitality of that now 90-year old precedent through its relatively recent decision in *Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005).

50.     Under *Grable*, it is now clear that "arising under" jurisdiction exists over state law claims which "necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314. In this "contextual enquiry," considerations such as the existence of a private federal right of action are "relevant to, *but not dispositive* of, the 'sensitive judgments about congressional intent' that [28 U.S.C.] §1331 requires." *Id.* at 318. (emphasis added).

51.     In *Grable*, the Supreme Court rejected a tendency among lower courts to interpret *Merrell Dow* too restrictively, as "converting a federal cause of action from a sufficient condition for federal-question jurisdiction into a necessary one." *Nicodemus v. Union Pac. Corp.*, 440

F.3d 1227, 1233 (10th Cir. 2006) (quoting *Grable* and noting its abrogation of Tenth Circuit precedent interpreting *Merrell Dow* restrictively).

52.     Under the artful pleading doctrine, a court may recharacterize a plaintiff's claim as a federal claim if federal law governs the particular conduct at issue. "[C]ourts will not permit [a] plaintiff to use artful pleading to close off defendant's right to a federal forum . . . [T]he removal court will seek to determine whether the real nature of the claim is federal, regardless of plaintiffs' characterization." *Federated Dep't Store, Inc. v. Moitie*, 452 U.S. 394, 397 n.2 (1981); *Franchise Tax Bd. v. Const. Laborers Vacation Trust*, 463 U.S. 1, 22 (1983) (plaintiff may not defeat removal by failing to plead necessary federal question in complaint); *Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009) (affirming removal because "[federal jurisdiction may be found from a complaint if adjudication of a state claim would turn on a federal constitutional or other important federal question, even where only state law issues have been pled." ); *BIW Deceived. v. Local S6, Indus. Union of Marine & Shipbuilding Workers of Am., L4MAW Dist. Lodge 4*, 132 F.3d 824, 831 (1st Cir. 1997) (holding removal proper if the claim appears to be federal in nature despite the plaintiff's professed intent to pursue only state-law claims).

53.     Thus, even when state law creates a plaintiff's cause of action, the action necessarily arises under the laws of the United States for purposes of federal question jurisdiction if the "well pleaded complaint" establishes that plaintiff's right to relief under state law requires resolution of a substantial question of federal law. *Franchise Tax Board*, 463 U.S. at 13; *Pet Quarters*, 559 F.3d at 779.

54.     The Sachars' Complaint asserts causes of action nominally sounding in Arkansas law—violations of the Arkansas Deceptive Trade Practices Act, breach of contract, unjust enrichment, conversion, and injunctive relief.

10

55.     The Sachars' omission of federal causes of action does not, however, defeat federal jurisdiction. *See, e.g., Lundeen v. Canadian Pac. Ry. Co.*, 532 F.3d 682 (8th Cir. 2008); *Gore v. Trans World Airlines*, 210 F.3d 944, 950 (8th Cir. 2000).

## The Sachars' Claims Raise Substantial Issues of Federal Law

56.     The Sachars' second claim is styled as a "breach of contract" claim but in substance is a claim alleging a breach of the duty of good faith and fair dealing. In this regard, the viability of such a claim is questionable, as the Supreme Court of Arkansas has not yet ruled whether Arkansas law recognizes a claim for breach of contract for failure to act in good faith where no express provision of the contract is violated. *Preston v. Stoops*, 285 S.W.3d 606, 609-10 (2008). IBERIABANK Corp. will, of course, test this proposition at the motion to dismiss stage. At this stage, however, IBERIABANK Corp. will assume that the Sachars are essentially arguing that, as is the case with the contract's express terms, the implied covenant is part of the contract and creates contractual obligations that are actionable. *See, e.g., Yarborough v. DeVilbiss Air Power, Inc.*, 321 F.3d 728, 732 (8th Cir. 2003).

57.     Thus, to the extent Arkansas law recognizes a claim for breach of contract based on a breach of an implied duty of good faith, such a claim would presumably be based on acts of "bad faith." The Sachars specifically allege that "Iberia's obfuscation of its intention to always resequence transaction from largest to smallest constitutes bad faith and unfair dealing in violation of the covenant of good faith and fair dealing." Compl. ¶ 124.

58.     To sustain this claim that IBERIABANK Corp. acted in bad faith, the Sachars must prove either that the federal law and regulations do not authorize IBERIABANK Corp.'s disputed actions or, if they do, that following federal law and regulations can constitute bad faith in Arkansas.

59.     This inquiry will necessarily require an analysis and interpretation of the many of federal laws and regulations that govern IBERIABANK Corp.'s conduct, and, if this case is

adjudicated in Pulaski County, Arkansas, the state court will be tasked with determining whether federal laws and regulations contravene Arkansas state law.

60.    It is thus clear that the Sachars' breach of contract claim will require the Court to resolve a substantial question of federal law.  This is a sufficiently "substantial" question of federal law as to support federal question jurisdiction under *Grable*.

61.    The unjust enrichment claim is another example of the federal questions embedded in the Sachars' Complaint, and will require the adjudicating court to decide whether IBERIABANK Corp. has unjustly received payments from the Sachars and the putative class members as a result of IBERIABANK Corp.'s disputed overdraft fees.

62.    To prove unjust enrichment, Plaintiffs must prove that the OTS (and for certain time periods, the OCC and the National Bank Act), as a matter of federal law, did not authorize IBERIABANK Corp. to impose and collect such fees, because if the collection of such fees was authorized, it cannot be unjust.  Thus, the Court must decide that question of federal law to adjudicate this Arkansas law claim.

63.    The Sachars' Complaint will require the resolution of substantial federal questions.  As a result, the Petition arises under the laws of the United States for purposes of federal question jurisdiction.

## IBERIABANK Corp.'s Recent Corporate History

64.    IBERIABANK Corp.'s operations in Arkansas during the proposed class period have been undertaken through several different entities.  Because each of these entities was subject to different federal regulations, it is important to review IBERIABANK Corp.'s recent corporate history in Arkansas.  This exercise will help elucidate why IBERIABANK Corp.'s operations in Arkansas for nearly the entire proposed class period were subject to the primary oversight of a federal regulator.

65.     Don P. Ledet, IBERIABANK Corp.'s Executive Vice President and the Director of Deposit Products and Retail Support, is generally familiar with the various banks and thrifts that IBERIABANK Corp. has acquired over the last several years, and, in connection with this Notice of Removal, he reviewed various merger documents and related documents to assist with his understanding of these issues.

66.     As of the date of this Notice of Removal (March 24, 2011), IBERIABANK Corp. can be most accurately characterized as the bank holding company for IBERIABANK—a 124-year old banking corporation based in Louisiana, with branches in Alabama, Arkansas, Florida Tennessee and Texas.  Ledet Decl., ¶ 8.

67.     IBERIABANK is a state-chartered bank, chartered under the laws of the state of Louisiana and a member of the Federal Reserve System.  *Id.* at ¶ 9.

68.     While it previously had a small number of customers in Arkansas whose accounts were held by IBERIABANK (the Louisiana state-chartered bank), IBERIABANK Corp. first formally entered the Arkansas market in early 2007.  *Id.* at ¶ 11.

69.     Specifically, on or about January 31, 2007, IBERIABANK Corp. acquired Pulaski Investment Corporation, the holding company for Pulaski Bank and Trust Company of Little Rock, Arkansas ("PBT") by merger.  PBT was a state-chartered bank, chartered under the laws of the state of Arkansas.  *Id.* at ¶ 12.

70.     On or about February 1, 2007, IBERIABANK Corp. acquired Pocahontas Bancorp, Inc., the holding company for First Community Bank of Jonesboro, Arkansas ("FCB"). FCB was a federally chartered savings institution (a/k/a an "S & L" or a "thrift") pursuant to 12 U.S.C. § 1461, *et seq.*  As such, FCB was under the supervision of the United States Department of Treasury, Office of Thrift Supervision (the "OTS") as its primary regulator.  *Id.* at ¶ 13.

71.     Subsequent to the consummation of these two acquisitions, IBERIABANK Corp. merged the PBT with and into FCB, the surviving institution in the merger.  *Id.* at ¶ 14.

13

72.     The OTS approved the merger effective April 22, 2007. In connection with the merger, the surviving institution, First Community Bank (the thrift), changed its name to the Pulaski Bank and Trust Company ("Pulaski"). *Id.* at ¶ 15.

73.     Effective April 22, 2007, Pulaski was a thrift under the supervision of the OTS, comprised of the former customers of FCB and PBT, and was a wholly owned subsidiary of IBERIABANK Corp. *Id.* at ¶ 16.

74.     On May 9, 2008, ANB Financial, National Association, Bentonville, Arkansas ("ANB")—a national bank based in Arkansas—was closed by the Office of the Comptroller of the Currency, and the Federal Deposit Insurance Corporation (FDIC) was named receiver. That same day, the FDIC's Board of Directors approved the assumption of the insured deposits of ANB Financial by Pulaski. In addition to assuming ANB's insured deposits, Pulaski purchased approximately $235.9 million of ANB's assets. The assets comprised certain of ANB's assets and were comprised mainly of cash, cash equivalents and securities. *Id.* at ¶ 17.

75.     IBERIABANK Corp.'s operations in Arkansas were conducted as Pulaski Bank and Trust through May 4, 2009. On May 4, 2009, Pulaski Bank and Trust was renamed "IBERIABANK*fsb*." This was a change in name only; IBERIABANK*fsb* continued to operate as a thrift under the supervision of the OTS. *Id.* at ¶ 18.

76.     On December 31, 2010, IBERIABANK Corp. merged the charter and operations of IBERIABANK*fsb* (the thrift based in Arkansas) into the charter of IBERIABANK (the state-chartered bank based in Louisiana). *Id.* at ¶ 19.

77.     In connection with this merger, the entity that emerged was IBERIABANK, a Louisiana state-chartered banking corporation, which is the wholly owned subsidiary of IBERIABANK Corp., the named defendant in this action. *Id.*

14

18437866.2

78.     This entity, IBERIABANK, now includes all of the former IBERIABANK*fsb* accounts, including all of the legacy PBT, FCB, Pulaki and ANB customer accounts. *Id.*

### Federal Pre-Emption Under the Home Owners' Loan Act

79.     As explained in the Ledet Declaration, most of the activity complained of in the Sachars' Complaint was conducted while Defendant IBERIABANK Corp. was the holding company for an Arkansas-based thrift under the supervision of the OTS. *Id.* at ¶¶18-19.

80.     Giving full credit to the Sachars' allegations, these "OTS period" transactions would include all transactions by IBERIABANK Corp., its subsidiaries, and, its predecessors in interest, with the exception of (1) PBT transactions from January 1, 2007 through April 22, 2007; (2) ANB transactions from January 1, 2007 through May 9, 2008; and (3) IBERIABANK transactions from January 1, 2011 through February 18, 2011 (the day the complaint was filed).

81.     Accordingly, all of the Sachars' claims arising out of the banking practices of IBERIABANK Corp., its subsidiaries, and its predecessors—while operating as federally chartered thrifts—under any of their various state common law or statutory theories, are preempted by the Howe Owners' Loan Act ("HOLA"), 12 U.S.C. §1461 *et seq.,* and applicable regulations.

82.     This is because state law purporting to limit or restrict a federally chartered thrift's activities is preempted by the HOLA.

83.     In the HOLA, Congress gave the OTS "plenary authority" to regulate the operations of federal savings associations. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 139, 141 (1982).

84.     The HOLA directs the OTS to "provide for the organization, incorporation, examination, operation, and regulations of … Federal savings associations."   12 U.S.C. §1454(a).

15

18437866.2

85.   As the Supreme Court has observed, "[i]t would have been difficult for Congress to give the [OTS] a broader mandate," *de la Cuesta*, 458 U.S. at 161 (internal quotation marks and citation omitted).

86.   Pursuant to this broad authority, the OTS has "promulgated regulations governing the powers and operations of every Federal saving and loan association from its cradle to its corporate grave." *Id.* at 145 (internal quotations marks and citation omitted).

87.   These regulations have the same preemptive force as statutes, *id.* at 153-54, and courts interpreting them have determined that "regulations by OTS has been so pervasive as to leave no room for state regulatory control." *Bank of Am. v. City & County of San Francisco*, 309 F.3d 551, 558 (9th Cir. 2002); *see also Nat'l State Bank, Elizabeth, N.J. v. Long*, 630 F.2d 981, 989 (3d Cir. 1980) (same).

88.   Not only is "state regulatory control" preempted, but OTS regulations explicitly state that they are also "preemptive of any state law purporting to address the subject of the operations of a Federal savings association." 12 C.F.R. §545.2, including state statutes and common law.

89.   In particular, the OTS has declared that it "occupies the entire field of federal savings associations' deposit-related regulations." 12 C.F.R. §557.11(b).

90.   The regulation continues:

> OTS intends to give federal savings associations maximum flexibility to exercise deposit-related powers according to a uniform federal scheme of regulation. Federal savings associations may exercise deposit-related powers as authorized under federal law, including this part, without regard to state laws purporting to regulate or otherwise affect deposit activities, except to the extent provided in §557.13.

*Id.*

91.   Importantly, "[s]tate law includes *any* statute, regulation, ruling, order, or judicial decision," *id.* (emphasis added), including laws of general applicability and the common law, *see*

16

*Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 443 (2005) (preemption analysis "reaches beyond positive enactments, such as statutes and regulations, to embrace common-law duties").

92.     The regulation further states: "OTS preempts state laws that purport to impose requirements governing the following[:] (b) Checking accounts; (c) Disclosure requirements; (d) Funds availability; [and] (f) Service charges and fees." 12 C.F.R. §557.12 (2011).

93.     Moreover, on February 14, 2005, the OTS issued a guidance stating that, in relevant part, it was permissible for a thrift to inform its customers that "transactions may not be processed in the order in which they occurred and that the order in which they are received by the savings association and processed can affect the total amount of overdraft fees incurred by the consumer." 70 Fed. Reg. 8431 (Feb. 18, 2005).

94.     The HOLA and its implementing regulations thus sweep broadly, occupying the entire field of regulating federal savings associations, their operations, and their powers with respect to deposits, checking accounts, and the imposition and calculation of service charges and fees. As one court recently summarized the matter, "if a law of general application requires a thrift and savings bank to affirmatively change its practices, it is preempted." *Guadagno v. E*Trade Bank*, 592 F.Supp.2d 1263, 1273 (C.D. Cal. 2008). State laws that "would affect [a federal savings association's] management of availability of funds in a checking account" are preempted by the HOLA. *Id.*

95.     Federal preemption, and the ouster of state law, serves the important policy of assuring that federally chartered banks may operate across state lines without the need to change common practices so as to conform to diverse preferences of multiple states.

96.     In connection with the posting practices that are the subject of the present action, for example, if each state where a bank did business could impose its own posting-order preferences, the result would be numerous and potentially disparate requirements that would make the business of banking and law-compliance across state lines unnecessarily complicated

17

and costly (with the costs invariably borne by *all* bank customers, even those who never overdraw accounts). Such a result would "throw into confusion the complex system of modern interstate banking." *Marquette Nat'l Bank v. First Omaha Serv. Corp.*, 439 U.S. 299, 312 (1978) (under section 85 of the NBA, a bank is "located" in its home state, not wherever particular banking transaction occurs); *Wachovia Bank v. Schmidt*, 546 U.S. 303, 318 (2006) (holding that national banks are only "located" in the state designated in the articles of association as locus of its main office.)

97.     The Ninth Circuit's decision in *Lopez v. Washington Mut. Bank, FA*, 302 F.3d 900 (9th Cir. 2002), illustrates the broad reach of HOLA preemption. *Lopez*, like this case, concerned the overdraft policy of a thrift—Washington Mutual. Plaintiffs argued that the thrift's use of the funds in their accounts derived from Social Security benefits to cover overdraft fees violated federal Social Security regulations and California state law. The Ninth Circuit first found no violation of the federal regulations. It then turned to the state claims, and held that they were preempted. The court found the state claims preempted because:

> By imposing requirements governing 'checking accounts,' 'funds availability' and 'service charges and fees,' [the California state law] falls within the specific categories that are preempted under Section 557.12.

*Id.* at 907.

98.     The Sachars' putative claims with respect to the overdraft practices of IBERIABANK Corp., its subsidiaries, and its predecessors in interest while operating as a thrift under the supervision of the OTS are therefore preempted.

99.     The Sachars' claims relate to how an institution (1) posts transactions to checking accounts, (2) calculates customers' balances and assesses overdrafts, and (3) charges fees in consequence. These matters are at the heart of any conception of "banking activities" and will fall within the scope of the preemption identified by the OTS's application regulation. The

18

Sachars thus seek—by force of state law—to regulate the substantive terms on which the bank can perform these functions.

100.    This OTS preemption issue raises substantial issues of federal law.  For instance, IBERIABANK Corp. could argue that it did not breach any implied duty of good faith when it acted in compliance with federal law.  Likewise, IBERIABANK Corp. could argue that it was not unjustly enriched, inasmuch as it complied with relevant federal law.

101.    But these issues will require whichever court hears this case to resolve substantial issues of federal law, which strongly militates in favor of this Court exercising its federal question jurisdiction.

**OCC PREEMPTION GOVERNS ANB'S
ACTS FROM JANUARY 1, 2007 – MAY 9, 2008**

102.    As set forth above, ANB was a national bank, chartered pursuant to National Bank Act, 12 U.S.C. § 21 *et seq.* (the "NBA"), with its charter residing in Arkansas.  ANB failed on May 9, 2008 and was taken over by the Federal Deposit Insurance Corporation (the "FDIC"), as Receiver.

103.    Also on May 9, 2008, the FDIC's Board of Directors approved the assumption of the insured deposits of ANB by Pulaski—at that time the name of IBERIABANK Corp.'s operating subsidiary in Arkansas.

104.    The former ANB customers automatically become Pulaski customers, then IBERIABANK*fsb* customers, and finally IBERIABANK customers.

105.    The Sachars' Complaint seeks to represent a class of "[a]ll Iberia customers who maintained checking accounts with an Arkansas branch office at any point between January 31, 2007 and the time of trial who incurred one or more overdraft fees as a result of Iberia's practice of resequencing checking account transactions from highest to lowest." Compl. ¶ 92.

19

106.   The Sachars' Complaint only excludes from the proposed class "any person, firm, trust, corporation, or other entity related to or affiliated with any defendant." *Id.* ¶ 93.

107.   As the former ANB customers for the period from January 1, 2007 through May 9, 2008 are not specifically *excluded*, they can be *included* for the purposes of determining whether this case can be properly removed.

108.   Inasmuch as ANB was a national bank, in seeking to impose liability for acts undertaken by ANB, the Sachars' Complaint improperly challenges the authority of the United States Department of Treasury, Office of the Comptroller of the Currency (the "OCC") to establish binding regulations as a matter of federal law.

109.   As discussed more fully below, the OCC has confirmed that national banks may collect overdraft fees and, in doing so, post transactions to a customer's account in a "high-to-low" order.

110.   Federal regulations also set forth notice requirements for overdraft fees. Nonetheless, the Sachars' Complaint seeks restitution in the form of the return of all overdraft fees on the theory that ANB—as predecessor in interest to IBERIABANK Corp.—violated Arkansas law by posting debit transactions in a "high-to-low" order, even though the OCC expressly condoned this practice, particularly during the relevant time period—January 1, 2007 through May 9, 2008.

111.   Thus, if this matter is not removed to federal court, a state court would have to decide whether the OCC has authority to authorize IBERIABANK Corp. to post debit transactions in a "high-to-low" order and, if so, whether Arkansas law had invalidated the OCC's regulations. The very purpose of federal question jurisdiction is to prevent such impermissible intrusions on federal authority. *See generally* John F. Pries, *Reassessing the Purposes of Federal Question Jurisdiction*, 42 Wake Forest L. Rev. 247, 292-93 (2007).

112.    National banks, such as the now-failed ANB, are created by the federal government pursuant to the NBA.

113.    The OCC is responsible for interpreting and implementing the NBA, for supervising national banks, and for enforcing the statutory and regulatory requirements to which those institutions are subject. *See NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256 (1995) (citing 12 U.S.C. §§ 1, 26-27, 481).

114.    One of the longstanding policies of the NBA is the protection of national banks' exercise of federally authorized powers from "the hazard of unfriendly legislation by the States." *Tiffany v. Nat'l Bank of Mo.*, 85 U.S. (18 Wall.) 409, 413 (1874).

115.    The NBA grants national banks extensive powers to conduct the "business of banking," subject only to restrictions imposed by federal statute and the federal bank regulatory agencies. 12 U.S.C. § 24; 12 C.F.R. §§ 7.4002, 7.4007, 7.4009; *see also Watters v. Wachovia Bank, NA.*, 550 U.S. 1 (2007); *Monroe Retail v. RBS Citizens, NA.*, No. 074263, 2009 WL 4749352 (6th Cir. Dec. 14, 2009); *Bank One v. Guttau,* 190 F.3d 844, 848 (8th Cir. 1999).

116.    Congress has delegated to the OCC authority to determine the scope of national banks' incidental powers under Section 24 (Seventh). *See U.S.C. § 93a; de la Cuesta*, 458 U.S. at 153 ("Federal regulations have no less preemptive effect than federal statutes.")

117.    In an exercise of this responsibility, the OCC has determined, by regulation, that the incidental powers of a national bank include the power to "charge its customers non-interest charges and fees." 12 C.F.R. § 7.4002(a). The regulation provides that "[t]he establishment of non-interest charges and fees, their amounts, and the method of calculating them are business decisions to be made by each bank, in its discretion, according to sound banking judgment and safe and sound banking principles." 12 C.F.R. § 7.4002(b)(2)(2011). The OCC has explicitly delineated the factors a national bank must consider in pricing fees. *See id.*

118. In its authoritative interpretations of Section 7.4002, the OCC has confirmed that operational choices affecting the pricing of overdraft fees, including specifically the order of posting transactions to customers' accounts, constitute exercise of the bank's federal powers. *See* OCC Interpretation Letter 997, 2002 WL 32639293 (April 15, 2002); *see also* OCC Interpretation Letter 916, 2001 WL 1285359 (May 22, 2001); *Monroe Retail*, 2009 WL 4749352 at *7 ("The OCC has consistently interpreted § 7.4002(a) as including the authorization to determine the order in which banks may post fees to an account.")

119. To calculate when overdraft fees are triggered, and in what quantity, a bank must post debits to a customer's account, and must determine the order in which to post them. The OCC has specifically determined that the power granted to national banks by Section 7.4002 includes the authority to use, at their discretion in accordance with safe and sound banking principles, a "high-to-low" order of posting debits to a customer's account. OCC Interpretation Letter 997, 2002 WL 32639293 at *3.

120. Thus, the OCC has confirmed that in determining how to post transactions to a customer's deposit account, a national bank is fully engaged in the "business of banking" and is exercising its federally granted powers to conduct that business. OCC regulations expressly provide that state laws "are not applicable to national banks" if they "obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized deposit taking powers." 12 C.F.R. § 7.4007(b)(1)(2011). Indeed, a "national bank may exercise its deposit taking powers without regard to state law limitations concerning" checking accounts, disclosure requirements and funds availability. 12 C.F.R. § 7.4007(b)(2).

121. As is the case with the OTS preemption issue, some of the Sachars' state law claims will require the resolution of substantial federal questions. As a result, their Complaint arises under the laws of the United States for purposes of federal question jurisdiction.

WHEREFORE, Defendant, IBERIABANK Corporation respectfully removes this action from the Circuit Court in and for Pulaski County, Arkansas (Case No. 60 CV 2011 0770), to this Court pursuant to 28 U.S.C. §§ 1331; 1332, 1441, 1446 and 1453.

Respectfully Submitted,

Elizabeth Robben Murray, Ark. Bar #79244
Kevin A. Crass, Ark. Bar #84029
**FRIDAY, ELDREDGE & CLARK, LLP**
400 W. Capitol Avenue, Suite 2000
Little Rock, Arkansas 72201
Telephone: (501) 376-2011
Facsimile: (501) 244-5356
E-mail: Murray@fridayfirm.com
E-mail: Crass@fridayfirm.com

Thomas J. Meeks (PHV motion to be filed)
Aaron Weiss (PHV motion to be filed)
**Carlton Fields, P.A.**
100 S.E. Second Street, Suite 4200
Miami, FL 33131
Telephone: (305) 530-0050
Facsimile: (305) 530-0055
E-mail: tmeeks@carltonfields.com
E-mail: aweiss@carltonfields.com

Attorneys for Defendant IBERIABANK Corporation

By: _Elizabeth Robben Murray_
Elizabeth Robben Murray

23

18437866.2

## Certificate of Service

I, Elizabeth Robben Murray, hereby certify that the March 24, 2011, the foregoing was presented to the Clerk of Court *via* hand-delivery, for filing and uploading to the CM/ECF system, and that a copy of the document was mailed, *via* United States Postal Service, to the following counsel of record:

Jack Wagoner
Wagoner Law Firm, P.A.
1320 Brookwood, Suite E
Little Rock, AR 72202
Jack@wagonerlawfirm.com

Brent Walker
Carter Walker, PLLC
P.O. Box 629
Cabot, AR 72023
bwalker@carterwalkerlaw.com

Steven A. Owings
Owings Law Firm
1400 Brookwood
Little Rock, AR 72202
sowings@owingslawfirm.com

By: _____
Elizabeth Robben Murray

24

18437866.2

**IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS**
**HON. JAY MOODY - 3RD DIVISION 6TH CIRCUIT**

Regarding      <u>DAVID J SACHAR ET AL V IBERIABANK CORPORATION</u>
Plaintiff's Attorney     JACK WAGONER
Case number      60CV-11-770

## SUMMONS

Plaintiff's Attorney:             JACK WAGONER
                                   1320 BROOKWOOD DRIVE
                                   SUITES D & E
                                   LITTLE ROCK AR 72202

The State of Arkansas to Defendant:     IBERIABANK CORPORATION ,

1. You are hereby notified that a lawsuit has been filed against you; the relief asked is stated in the attached complaint.

2. The attached complaint will be considered admitted by you and a judgment by default may be entered against you for the relief asked in the complaint unless you file a pleading and thereafter appear and present your defense. Your pleading or answer must meet the following requirements:

   A. It must be in writing, and otherwise comply with the Arkansas Rules of Civil Procedure;
   B. It must be filed in the court clerk's office within **30** days from the day you were served.
   C. A copy of your response must be delivered or mailed with sufficient postage to the plaintiff's attorney or to the plaintiff.

3. If you desire to be represented by an attorney you should immediately contact your attorney so that an answer can be filed for you within the time allowed.

4. Additional notices:

Witness my hand and seal of said court dated February 22, 2011.

LARRY CRANE,  CIRCUIT CLERK           By: _____
CIRCUIT COURT OF PULASKI COUNTY
401 W MARKHAM
LITTLE ROCK, AR 72201

---

## SHERIFF'S RETURN

STATE OF ARKANSAS  (COUNTY OF PULASKI)

On this ____day of_____, 20___ at _____o'clock __am/pm, I have duly served the summons by delivering a copy thereof (or stating the substance thereof), together with a copy of the complaint, to _____ such person being:

CHECK APPLICABLE SQUARE:
   □  the person named therein as defendant
   □  some person residing at defendant's dwelling _____ of abode who is at least fourteen (14) years of age, namely:_____



☐ the duly authorized agent for service of process for the defendant,
namely:_____.

☐ OTHER:_____

_____
Officer

Return filed this _____day of_____, _____

LARRY CRANE,  CIRCUIT CLERK

By: _____D.C.

IN THE CIRCUIT COURT FOR PULASKI COUNTY, ARKANSAS

## 3RD DIVISION— DIVISION

FILED 02/18/11 14:42:37
Larry Crane Pulaski Circuit Clerk
FG

DAVID J. SACHAR, and CHRISTINE
M. SACHAR, as individuals and on
behalf of all others similarly situated                                      **PLAINTIFFS**

v.                          CASE NO. 60CV2011 0770

IBERIABANK CORPORATION                                              **DEFENDANT**

<u>COMPLAINT</u>

Plaintiffs David J. Sachar and Christine M. Sachar acting individually and on behalf of all other persons similarly situated, for their complaint and demand for jury trial, state and allege as follows:

I.      INTRODUCTION.

1.      This complaint asserts causes of action and claims for damages on behalf of the plaintiffs and all others similarly situated against Defendant for its practice of resequencing the posting of customer checking account transactions for the sole purpose of generating the largest possible number of overdraft fees. Plaintiffs ask the Court to certify this case as a class action, and to award the relief requested herein.

2.      Iberia engaged in a practice of resequencing transactions in its customers' accounts in high-to-low order — posting the largest transactions first and the smallest transactions last.

3.      High-to-low posting of customer account transactions is designed to increase the number of overdraft fees ("NSF fees") charged to customers who mistakenly overdraw their checking accounts. For example, consider a customer with a

60CV-11-770      601-60100022745-020
DAVID J SACHAR ET AL V IBER 56 Pages
PULASKI CO          02/18/2011 02:44 PM
CIRCUIT COURT                    CC05$

$100 balance in his checking account who makes three five dollar debit purchases with his checking debit card in the morning, and one $100 debit purchase in the afternoon. One would expect the three five dollar purchases to clear the account. There should be $85 in the account after those three purchases were made. When the $100 charge is made later in the day, there would not be sufficient funds to cover the $100 debit, and one bank charge for drawing an item against insufficient funds is deducted from the customer's account. Defendant's practice of high-to-low resequencing of transactions causes the $100 transaction to be processed first. It would clear and a zero balance would remain. The three five dollar items are then processed – with each of the three items incurring a bank charge. Through high-to-low posting, Iberia in the example given, collects <u>three</u> $30 NSF fees ($90) instead of one ($30).

4.     Iberia did not inform its customers that their transactions would be resequenced through high-to-low posting. Bounce Protection Privilege, in essence, allowed Iberia customers to make debit card and check purchases even when these were not sufficient funds in the customer's accounts.

5.     Iberia automatically enrolled customers in its service entitled "Bounce Protection Privilege" without any authorization from the customers.

6.     With Iberia's "Bounce Protection Privilege," a debit card charge would not be declined at the point of purchase when the customer did not have sufficient funds in his account to cover the purchase. Instead, Iberia would approve the purchase and charge an NSF fee to the customer for making the debit purchase with insufficient funds in the account. Iberia would typically allow a customer to overdraw an account by up to

2

$500 with Bounce Protection Privilege.

7.    In 2010, the Federal Reserve Board Amended Regulation E to the Electronic Funds Transfer Act to prohibit banks like Iberia from automatically enrolling customers in standard overdraft protection without their consent.

8.    Iberia was required by Federal Law to cease automatically enrolling new customers in standard overdraft protection by July 1, 2010, and to cease the automatic enrollment of existing customers by August 15, 2010.

9.    Since Regulation E was amended in 2010, Iberia has been forbidden from automatically enrolling customers in standard overdraft protection.  However, Iberia continues to market the service to customers without disclosing its practice of resequencing transactions into high-to-low order and the impact of this practice.

10.   Plaintiffs do not challenge Iberia's questionable practice of enrolling customers in overdraft protection coverage without their consent.  This lawsuit is about the damages that Plaintiffs' have incurred as a result of Iberia's undisclosed practice of resequencing the order in which account transactions are processed -- so as to exponentially increase the amount of overdraft fees Iberia charged customers with overdraft protection coverage.  Bounce Protection Privilege allowed a customer to make a purchase even when his account did not have sufficient funds to cover the purchase. In the example given in Paragraph three (3) above, the customer would expect to incur one NSF fee, but would face three (3) NSF fees resulting from Iberia's undisclosed hih-to-low resequencing practice.

11.   Iberia Bank uses its computer systems and/or software to manipulate

3

customers' transaction posting order to increase the number of fees.

12.    "High-to-low" posting as practiced by Iberia is a deceptive business practice.

13.    Iberia Bank's business practices allowed it to unconscionably profit by wringing large sums in overdraft fees out of its customers in Arkansas without providing them with any benefit.

14.    The acts complained of herein are unfair and deceptive business practices in violation of the Arkansas Deceptive Trade Practices Act (ADTPA) and the common law of Arkansas as more fully set out below.

15.    This case is a proposed class action brought against Iberia Bank on behalf of a state-wide class of account holders.

II.    PARTIES

16.    David and Christine Sachar are residents of Pulaski County, Arkansas and had bank accounts at Iberia Bank.  David and Christine Sachar ask the Court to appoint them as class representatives as more fully set out below.

17.    IBERIABANK CORPORATION is a foreign for profit corporation licensed to do business in the State of Arkansas.

18.    IBERIABANK CORPORATION's agent for service of process in the state of Arkansas is the Corporation Company, 124 West Capitol Avenue, Suite 1900, Little Rock, AR 72201.

19.    IBERIABANK CORPORATION initially did business in Arkansas through its wholly-owned subsidiary, IberiaBank*fsb*.  IberiaBank*fsb* was merged into IBERIABANK

4

CORPORATION on December 31, 2010.

20.    IBERIABANK CORPORATION is liable for the actions of IberiaBank*fsb* taken prior to the merger of IberiaBank*fsb* and IBERIABANK CORPORATION.

21.    IberiaBank*fsb* initially conducted some or all of its operations in Arkansas under the name Pulaski Bank, Pulaski Bank and Trust, or a similar name, but later ceased to use the Pulaski name in its operations.

III.    JURISDICTION AND VENUE

22.    Substantial acts giving rise to the causes of action asserted herein occurred in this State and within this venue.

23.    Jurisdiction is proper in this Court because class representatives David J. Sachar and Christine M. Sachar reside in Pulaski County, Arkansas, and all proposed class members are citizens of Arkansas and/or are protected by the provisions of the Arkansas Deceptive Trade Practices Act and the common law of this State.

24.    Venue is proper in this Court.

IV.    STATEMENT OF FACTS AND ALLEGATIONS

a.    *Posting, Resequencing of Posting Order, and the Effect on the Customer*

25.    Sometime after the close of the banking day, often in the early hours of the morning, banks engage in a process called "posting."

26.    Posting is the process where transactions for a set period of time "post" to a customer's bank account, causing increases or decreases in the available balance in the account. Iberia posted one day's worth of transactions during the week, while

5

Saturday, Sunday, Monday and bank holiday transactions were "batch-processed" in one posting.

27.    Banks can use different methods for ordering the transactions that post to an account.   Three possibilities, for example, are chronological posting, low-to-high posting, and high-to-low posting.  Most banks use low-to-high posting.

28.    The posting order employed by a bank may have dramatic consequences in the context of account overdrafts.

29.    Iberia manipulates transaction posting order to post transactions from largest to smallest ("high-to-low posting").  This is not disclosed to the customer.

30.    High-to-low posting has the effect of maximizing the number of overdraft fees.

31.    High-to-low posting turns what would ordinarily be *one* overdraft into *many* overdraft fees, dramatically multiplying the number of fees the bank charges for a single mistake by a customer.

32.    High-to-low posting caused customers to incur overdraft fees for transactions that were *covered by the customer's existing account balance at the time the transaction was made.*

33.    For example, if a customer with a $100 balance in his checking account makes three five dollar debit purchases with his checking debit card in the morning, and one $100 purchase in the afternoon, one would expect the three five dollar purchases to clear the account.   There should be $85 in the account after those three purchases are made.  When the $100 charge is made later in the day, there would not be sufficient

6

funds to cover the $100 debit, and   one bank charge for drawing an item against insufficient funds would be deducted from the customer's account. Defendant's practice of high-to-low resequencing of transactions causes the $100 transaction to be processed first. The $100 transaction clears first and a zero balance remains. The three five dollar items are then processed – with each of the three items incurring on NSF fee.

34.    Iberia's practices transform a single NSF fee into multiple fees through it's transaction resequencing process of posting transactions from highest to lowest. The sole purpose of this practice is to generate the largest possible amount of fee income for the bank.

35.    Iberia does not disclose to customers that it employs high-to-low posting when ordering transactions in the posting process.

36.    Plaintiffs allege that it was Iberia's conscious intent and sole purpose to reap excessive fees through the use of high-to-low posting.

37.    Prior to regulatory changes implemented in 2010, Iberia Bank automatically enrolled all of its customers in standard overdraft protection, which Iberia called "Bounce Protection Privilege."

38.    Under its standard overdraft-protection plan, Iberia Bank allowed customers to overdraw their accounts, then charged the customer a per transaction overdraft fee that ranged from approximately $22.50 to $30 during the relevant time period.

39.    Iberia Bank automatically enrolled its customers in this Bounce Protection Privilege "service" without their consent and without disclosing that all checking account

7

items would be resequenced and posted in high-to-low order.

40.     Posting the largest transactions first results in the most rapid consumption of a customer's available balance, so numerous small transactions trigger the maximum possible number of overdraft fees. An example of this can be seen by looking at what happened with the Plaintiffs' account over the Memorial Day weekend in 2010. The first banking day after Memorial Day weekend 2010 was Tuesday, June 1. On that date, Iberia bundled all transactions occurring from Saturday, May 29 through Tuesday, June 1, and posted them in high to low order. The result was as follows:

| Description | Debit Amount | Balance |
| --- | --- | --- |
| Target 5/29 | ($177.15) | $1152.40 |
| Best Buy 5/29 | ($112.64) | $1039.76 |
| Gander Mtn 5/30 | ($105.96) | $933.80 |
| Bill pay from checking 5/29 | ($93.88) | $839.92 |
| Check 6084 | ($90.30) | $749.62 |
| Check 6085 | ($90.30) | $659.32 |
| TLF Search Flo 5/29 | ($81.00) | $578.32 |
| Macaroni Grill 5/30 | ($76.97) | $501.35 |
| Loca Luna 5/31 | ($73.58) | $427.77 |
| Sekisui 5/31 | ($68.83) | $358.94 |
| Kmart 5/29 | ($60.35) | $298.59 |
| Barnes and Noble 5/30 | ($50.28) | $248.31 |
| Shell 5/29 | ($41.80) | $206.51 |
| CheeburgerCheeburger 5/30 | ($40.32) | $166.19 |
| CNS Academy 5/29 | ($26.83) | $139.36 |
| Walgreen 6/1 | ($22.98) | $116.38 |
| Wal Mart 5/29 | ($21.92) | $94.46 |
| Walgreen 5/30 | ($20.36) | $74.10 |
| ExxonMobil 5/31 | ($19.99) | $54.11 |
| Kmart 6/1 | ($14.13) | $39.98 |
| Popeye's 6/1 | ($12.88) | $27.10 |
| Books and Bruins 5/29 | ($11.24) | $15.86 |
| Coldstone 5/30 | ($8.63) | $7.23 |
| Tropical Smooth 6/1 | ($8.28) | -$1.05 |

8

| NSF CHARGE | ($30.00) | -$31.05 |
| Subway 5/30 | ($7.98) | -$39.03 |
| NSF CHARGE | ($30.00) | -$69.03 |
| Coldstone 6/1 | ($7.33) | -$76.36 |
| NSF CHARGE | ($30.00) | -$106.36 |
| Subway 6/1 | ($6.02) | -$112.38 |
| NSF CHARGE | ($30.00) | -$142.38 |
| Suds 6/1 | ($6.00) | -$148.38 |
| NSF CHARGE | ($30.00) | -$178.38 |

The high-to-low posting process resulted in five NSF fees totaling $150 on five debit purchases which each ranged from $6 to $8.33.

Had Iberia employed low-to-high posting, the result would have been as follows, and only one NSF fee would have occurred:

| Company | Debit Amount | Balance |
| --- | --- | --- |
| Suds 6/1 | ($6.00) | $1323.55 |
| Subway 6/1 | ($6.02) | $1317.53 |
| Coldstone 6/1 | ($7.33) | $1310.20 |
| Subway 5/30 | ($7.98) | $1302.22 |
| Tropical Smooth 6/1 | ($8.28) | $1293.94 |
| Coldstone 5/30 | ($8.63) | $1285.31 |
| Books and Bruins 5/29 | ($11.24) | $1274.07 |
| Popeye's 6/1 | ($12.88) | $1261.19 |
| Kmart 6/1 | ($14.13) | $1247.06 |
| ExxonMobil 5/31 | ($19.99) | $1227.07 |
| Walgreen 5/30 | ($20.36) | $1206.71 |
| Wal Mart 5/29 | ($21.92) | $1184.79 |
| Walgreen 6/1 | ($22.98) | $1161.81 |
| CNS Academy 5/29 | ($26.83) | $1134.98 |
| CheeburgerCheeburger 5/30 | ($40.32) | $1094.66 |
| Shell 5/29 | ($41.80) | $1052.86 |
| Barnes and Noble 5/30 | ($50.28) | $1002.58 |
| Kmart 5/29 | ($60.35) | $942.23 |
| Sekisui 5/31 | ($68.83) | $873.40 |
| Loca Luna 5/31 | ($73.58) | $799.82 |
| Macaroni Grill 5/30 | ($76.97) | $722.85 |
| TLF Search Flo 5/29 | ($81.00) | $641.85 |

| | | |
|---|---|---|
| Check 6085 6/1 | ($90.30) | $551.55 |
| Check 6084 6/1 | ($90.30) | $461.25 |
| Bill pay from checking 5/29 | ($93.88) | $367.37 |
| Gander Mtn 5/30 | ($105.96) | $261.41 |
| Best Buy 5/29 | ($112.64) | $148.77 |
| Target 5/29 | ($177.15) | -$28.38 |
| NSF CHARGE | ($30.00) | -$58.38 |

41.    Historically, banks have used low-to-high posting.  In recent years, there have been a number of banks caught engaging in the high-to-low posting scheme in an attempt to unfairly profit at their customers' expense.  Courts have sided with bank customers making claims relating to this unfair and deceptive practice. See, e.g., White v. Wachovia Bank, N.A., 563 F. Supp. 2d 1358 (N.D. Ga. 2008) Gutierrez et al v. Wells Fargo Bank, N.A., 730 F. Supp. 2d 1080 (N.D. Cal. 2010)(approximately 203 million dollars in restitution ordered after trial of class action case); In re Checking Account Litigation, 694 F. Supp. 2d 1302 (S.D. Fla. 2010)(Bank of America agrees to pay $410 million to settle similar claims after motion to dismiss class action claims denied).

42.    Because Iberia Bank resequences the transaction posting process, many of the overdraft fees customers incur are on transactions for which customers had a sufficient balance at the time they made that transaction.  See, for example, **Exhibit 1**, which is the bank statement from which the table of transactions set forth in Paragraph 17 above was taken.  Note that on May 30, 2010, the statement shows an NSF charge of $30 for a $7.98 debit purchase, while the Daily Balance Information on the same statement shows that the Plaintiffs had $362.24 in their account at the end of that same day.

43.     Even a careful Iberia customer, one who checks their account balance online in "real time," could rely on his Bounce Protection Privilege at the end of a day and make one debit purchase in excess of his account balance. But instead of one NSF fee, the customer may well find himself facing three, four, five or more NSF fees.

44.     A customer can check his account balance online or at an ATM and determine that there are funds in the account, then engage in a debit transaction that is recorded immediately in Iberia's electronic account information system. If that customer checks his balance shortly after the transaction he will see the debit entry, and he will see that sufficient funds are available to cover the debit. But under Iberia's high-to-low posting scheme, the transaction may nonetheless incur an NSF fee.

45.     Because Iberia resequences or sorts the transactions at the end of the day or at the time transactions are batch processed for weekends and holidays, the account information available to the customer online or at an ATM machine is misleading. Therefore, additional fees and charges are triggered when the customer relies upon the online balance information or ATM statement of account.

b.     *Deceptive Marketing and Misrepresentations to Customers*

46.     Iberia conceals, obfuscates, and misrepresents its posting resequencing practices to consumers.

47.     None of the materials provided to plaintiffs or class members through any mode of communication indicates that Iberia will resequence transactions from largest to smallest to increase the number of NSF fees customers with Bounce Protection Privilege will incur for overdrafts.

11

48. When a customer opened a new account with Iberia during the relevant time period, Iberia provided a two page document entitled: "YOUR DEPOSIT ACCOUNT TERMS AND CONDITIONS." This document states that the document, along with "any other documents we give you pertaining to your account" constitutes a contract. A copy of this document is attached to this Complaint as **Exhibit 2**. Nowhere in this document is it disclosed to the customer that Iberia will process transactions in high to low order. Nowhere in this document is it disclosed that the customer will be enrolled automatically in Bounce Protection Privilege.

49. When a customer opened a new account with Iberia during the relevant time period, Iberia provided another five page document entitled: "ELECTRONIC FUND TRANSFERS - YOUR RIGHTS AND RESPONSIBILITIES." A copy of this document is attached to this Complaint as **Exhibit 3**. Nowhere in this document is it disclosed to the customer that Iberia will process transactions in high to low order. Nowhere in this document is it disclosed that the customer will be enrolled automatically in "Bounce Protection Privilege."

50. When a customer opened a new account with Iberia during the relevant time period, they may have also been provided with a third document entitled: "TRUTH IN SAVINGS DISCLOSURE." A copy of this document is attached to this Complaint as **Exhibit 4**. Nowhere in this document is it disclosed to the customer that Iberia will process transactions in high to low order. Nowhere in this document is it disclosed that the customer will be enrolled automatically in Bounce Protection Privilege.

51. No other documents other than **Exhibits 2, 3,** and **4** were provided to

12

customers opening accounts with Iberia during the relevant time period. The forms used by Iberia during the relevant time period may have varied slightly from those attached as **Exhibits 2, 3, and 4**, (see, for example, attached **Exhibit 5**), but the forms used and information provided by Iberia to its customers did not materially vary at any time from the information provided (or, rather, *not* provided) in **Exhibits 2, 3, and 4**. At no time during the relevant time period did Iberia advise account holders of its high to low ordering process.

52.    In general, customers were not automatically enrolled in standard overdraft protection when an account was first opened. *After* an account was opened, Iberia would send a letter such as attached **Exhibit 6** to the customer. This letter would advise the customer that he/she was "automatically" being enrolled in an optional overdraft service called "Bounce Protection Privilege."

53.    The customer was informed that the Bounce Protection Privilege service would allow the customer to overdraw their account by up to $500 and checks would be paid up to the time that this overdraft limit of $500 was reached.

54.    Iberia did not automatically enroll most customers in "Bounce Protection Privilege" when an account was initially opened because they wanted to first determine which customers were credit-worthy before setting them up for exponentially greater overdraft charges. That is, Iberia recognized that allowing customers to overdraw their accounts by continuing to authorize point-of-sale debit card transactions, even after customers' accounts were overdrawn, would allow them to reap extensive additional overdraft fees from the customer – frequently resulting in hundreds of dollars in overdraft

13

fees for a handful of small point-of-sale debit purchases. But the ploy failed if a customer did not soon deposit sufficient funds to restore the negative balance in the account to a positive balance.

55.    Once Iberia had reviewed a customer's account history, credit report, or otherwise determined that a particular customer did not pose a high threat of abandoning their overdrawn account and leaving Iberia holding an account with a negative balance, a letter such as **Exhibit 6** would issue to the customer and Iberia would automatically enroll the customer in its "Bounce Protection Privilege" service – with no disclosure of Iberia's high-to-low resequencing scheme or its implications.

56.    Automatically enrolling the customer in "Bounce Protection Privilege" overdraft coverage gave Iberia the ability to compound the damaging effect that high to low transaction posting had on its customers. An example of this is attached **as Exhibit 7. Exhibit 7** is a "Bounce Protection Notice" sent by Iberia to a customer on December 22, 2010. At the beginning of that day, the customer had $280.58 in her account. Using high to low posting, combined with the "Bounce Protection Privilege," here is what happened:

14

**Example 1: High to low posting with overdraft protection**

| Transaction | | Balance |
|---|---|---|
| Starting balance | | $280.58 |
| Debit Purchase | ($236.93) | $43.65 |
| Debit Purchase | ($183.35) | ($139.70) |
| **Overdraft Fee** | **($30.00)** | ($169.70) |
| Debit Purchase | ($60.48) | ($230.18) |
| **Overdraft Fee** | **($30.00)** | ($260.18) |
| | | |

Compare the above to what would have happened with these three debit card transactions if the transactions were processed in low-to-high order instead of high-to-low order:

15

**Example 2: Low to high posting with overdraft protection**

|  |  | Balance |
|---|---|---|
| December 20, 2008 |  | $280.58 |
| Debit purchase | ($60.48) | $220.01 |
| Debit purchase | ($183.35) | $36.75 |
| Debit purchase | (236.93) | ($200.18) |
| **Overdraft fee** | **($30.00)** | **($230.18)** |
|  |  |  |
|  |  |  |

Note that through using high-to-low order, Iberia doubled the overdraft fees charged to the customer. High-to-low posting resulted in two of the three items posted incurring an overdraft charge. Low-to-high posting would have resulted in only one of the three debit transactions incurring an overdraft charge.

57.   To the extent Iberia discloses that it will exercise discretion in determining how to post transactions, Iberia's actions in processing the transactions in high-to-low order so as to cause the most harm to the customer and create the greatest windfall for Iberia constitute a breach of the contractual obligation of good faith and fair dealing attendant to all contracts under Arkansas law.

16

58. Iberia's website and online banking service are deceptive.

59. For example, when a customer logs into online banking, pending transactions on the customer's transaction register show up in the order in which Iberia received them ("real time") but the transaction order will be changed at the end of the day when they are posted in high-to-low order to increase the number of fees Iberia can charge.

60. Iberia's "pending transactions" display misleads the customer into believing it correctly reflects the transaction ordering and sequencing, when Iberia intends all along to re-order the transaction posting.

61. Iberia even misrepresents the order in which transactions are posted on the monthly bank statements it provides to its customers. Iberia comingles, or "batch-processes" all transactions which occur on Saturday, Sunday, and Monday. Iberia takes all transactions occurring during such non-business days and batch processes them with the transactions occurring on the first business day thereafter. However, the bank statements that Iberia sends its customers show the transactions for each date being posted separately.

62. Iberia's practice of using high-to-low posting in its standard overdraft-protection service is particularly wrongful in light of the advent of debit cards and automated teller machines (ATMs). This is because these transactions are received by the bank and reported instantly, or in "real time."

63. Debit cards allow consumers to make "point-of-sale" (POS) transactions and withdraw money from ATMs.

17

64. As soon as a customer makes a transaction with their debit card, Iberia receives nearly instantaneous notification of the transaction and Iberia, therefore, knows the order in which the transactions are made.

65. As exemplified in **Exhibit 6**, Iberia's practice during at least a portion of the time period covered by this lawsuit was to notify customers that they would be allowed to overdraw their account by up to $500.00.

66. Iberia's practice of resequencing transactions from high to low combined with Iberia's Standard Overdraft Protection cost members of the proposed Class easily avoidable overdraft fees.

67. When a customer is charged an overdraft fee, the fee is automatically added to any negative balance on the customer's account.

68. Because of Iberia's overdraft practices, the customer who overdraws his account by a small amount may be required to pay hundreds of dollars in overdraft fees before he can use his account again. This practice falls hardest upon those who are least able to pay the excessive fees and climb out of the financial hole created by Iberia's business practices.

69. The customer's use of his bank account is restricted until the overdraft fees are paid, whether the overdraft fees were erroneously charged or not.

70. Iberia's unilateral and wrongful resequencing of transactions to maximize fees results in numerous wrongful and unlawful overdraft fees.

18

## V.     FACTS AS TO DAVID AND CHRISTINE SACHAR

71.    David J. Sachar and Christine M. Sachar opened an account at Pulaski Bank and Trust in 2000.

72.    On January 31, 2007, Pulaski Bank and Trust was acquired by Iberia.

73.    Christine and David Sachar were notified of the buyout and chose to keep their bank account with Iberia.

74.    Christine and David Sachar had a Pulaski Iberia checking account and debit card throughout the class period.

75.    Iberia advertised the ease of use and accuracy of "real time" banking through online account information and account information available at automated teller machines.

76.    Christine and David Sachar utilized and relied upon Iberia's online account information service to obtain what they believed was accurate information about their account balance.

77.    Iberia never provided any notice or disclosure to the Sachars, or to any of the class members, about its practice of resequencing account transactions in high-to-low order to maximize the overdraft fees charged to customer accounts.

78.    During the Memorial Day weekend, May 28-31, 2010, the Sachars made one banking transaction that could have been expected to generate one overdraft fee. After the close of the first banking day following that weekend (June 1, 2010), Iberia resequenced the Sachars' transactions from largest to smallest, triggering a cascade of overdraft fees.

19

79.   **Exhibit 8** is an itemization of the Sachars checking account transactions from May 29 through June 1, 2010 ranking the transactions from lowest amount to highest amount. This exhibit demonstrates that ranking the transactions from lowest to highest results in one overdraft fee. The same would be true if they were arranged in chronological order.

80.   **Exhibit 9** is an itemization of the Sachars checking account transactions from May 29 through June 1, 2010 after Ibera resequenced the transactions from highest amount to lowest amount. This exhibit demonstrates that ranking the transactions from highest to lowest results in five $30 overdraft fees.

81.   This cascade of overdraft fees continued through Wednesday following the long weekend, when Iberia posted the Sachars' deposit to the account, which made the balance positive again, albeit significantly lower than the Sachars originally anticipated because of the excessive fees.

82.   Iberia's high-to-low posting scheme caused the Sachars in excess of $120 in excess overdraft fees on the one occasion noted alone.

83.   Christine Sachar complained to Iberia and spoke to a supervisor, who responded "this is how we do things."

84.   David and Christine Sachar paid the fees as posted to their account when they transferred money from another account to cover the shortfall created by the excessive fee charges.

85.   The Sachars had sufficient funds in their checking account to cover all of the transactions except one.

86. Plaintiffs and members of the proposed Class have been wrongfully forced to pay excessive overdraft fees.

87. Iberia has deprived Plaintiffs and members of the proposed Class of significant funds, causing ascertainable monetary losses and damages.

88. Iberia has wrongfully deprived Plaintiffs and members of the proposed Class of funds to which it had no legitimate claim.

VI.   UNIFORMITY OF BUSINESS PRACTICES THROUGHOUT ARKANSAS

89. At all relevant times, "high-to-low" posting was used by Iberia without consent (or disclosure) uniformly to all Iberia account holders in Arkansas.

VII.   CLASS ALLEGATIONS

   a.   *Proposed Class Definition*

90. Plaintiffs bring this action on behalf of themselves and all others similarly situated and ask the Court to certify this case as a class action pursuant to Arkansas Rule of Civil Procedure 23.

91. This action satisfies the Rule 23 requirements of numerosity, commonality, typicality, adequacy, predominance, and superiority, as more fully set out below.

92. The proposed Class is defined as:

All Iberia customers who maintained checking accounts with an Arkansas branch office at any point between January 31, 2007 and the time of trial who incurred one or more overdraft fees as a result of Iberia's practice of resequencing checking account transactions from highest to lowest.

93. Excluded from the proposed Class are defendants and any person, firm,

21

trust, corporation or other entity related to or affiliated with any defendant.

94.    The proposed Class is composed of thousands of Arkansas Iberia account holders, the joinder of which in one action would be impracticable.  The disposition of the claims of the proposed class members through this class action will benefit both the parties and the Court.  The identities of individual members of the proposed Class are readily ascertainable through the defendant's account records.

> b.    *Numerosity*

95.    The members of the proposed Class are so numerous that joinder is impractical.  The classes consist of thousands of members, the identity of whom is within the knowledge of IberiaBank and can be ascertained only by resort to Iberia Bank's records.

> c.    *Typicality*

96.    The claims of the representative Plaintiffs are typical of the claims of the proposed Class in that the representative Plaintiffs, like all members of the proposed Class, were charged overdraft fees by Iberia as a result of its practice of resequencing transactions from highest to lowest.

> d.    *Adequacy of Class Representatives.*

97.    The representative Plaintiffs, like all members of the proposed Class, have been damaged by Iberia's misconduct in that they have been assessed, and/or will continue to be assessed, unfair and unconscionable overdraft fees.

98,    Representative Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class

actions and, in particular, class actions on behalf of consumers against financial institutions.

99. Accordingly, Representative Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the proposed Class.

   e. *Commonality*

100. The factual basis of Iberia's misconduct is common to all members of the proposed Class, and is a common wrong resulting in injury to all members of the Classes.

   f. *Predominance of Common Issues over Individual Issues*

101. There are numerous questions of law and fact common to the proposed Class and those common questions predominate over any questions affecting only individual class members.

102. All class members have suffered damages as a result of a "common wrong" on the part of Iberia. Damages are ascertainable by reference solely to Iberia's records of transactions and overdraft fees charged to each class member.

103. Plaintiffs' claims are typical of the claims of other members of the proposed Class, in that they arise out of the same wrongful overdraft policies and practices and the same or substantially similar unconscionable provisions of Iberia's account agreements and other related documents.

104. Plaintiffs have suffered the harms alleged in this complaint and have no interests antagonistic to the interests of any other member of the proposed Class.

g.     *Superiority.*

105. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

106. Plaintiffs and members of the proposed Class have all suffered harm as a result of defendant's fraudulent, deceitful, unlawful, and unfair conduct.

107. Since the amount of each putative Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Iberia, few, if any, members of the proposed Class could afford to seek legal redress individually for the wrongs complained of herein.

108. Absent a class action, members of the proposed Class will continue to suffer losses, the violations of the law described herein will continue without remedy, and defendant will be permitted to retain the proceeds of their deceptive and misleading business practices, and Iberia's misconduct will proceed without remedy.

109. Defendants continue to engage in the unlawful, unfair, and unconscionable conduct that is the subject of this Complaint.

110. Even if members of the proposed Class themselves could afford such individual litigation, the court system could not. Individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings.

111. A class action, on the other hand, presents far fewer management difficulties, allows claims to be heard that might otherwise go unheard because of the

24

relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

VIII.  CAUSES OF ACTION

## COUNT I - DECEPTIVE TRADE PRACTICES
*Violations of Arkansas Deceptive Trade Practices Act - A.C.A § 4-88-101, et seq.*

112. Plaintiffs restate and reallege the preceding paragraphs of the Complaint as though set out here word for word.

113. Defendant's actions violate the Arkansas Deceptive Trade Practices Act, specifically the following: (a) A.C.A. § 4-88-107(a)(10) by engaging in unconscionable, false or deceptive acts and practices in business, commerce and trade; (b) A.C.A. § 4-88-108 by concealing, suppressing and omitting material facts.

114. Specifically, Defendant violated the ADTPA when it enrolled account holders in the Bounce Protection Privilege program and concealed, suppressed and omitted the material information that Iberia would process transactions in high-to-low order so as to maximize NSF fees and to generate NSF fees which would not have occurred absent the high-to-low resequencing process employed by Iberia.

115. Defendant's practices as alleged in this complaint are not actions or transactions permitted under laws administered by any state agency, and are, therefore, not exempt from the provisions of the Arkansas Deceptive Trade Practices Act.

116. Plaintiffs are entitled to damages and an award of attorney fees pursuant to A.C.A. § 4-88-113(f) because they have sustained actual damages as a result of the acts of Defendants.

117. Plaintiffs were unreasonably and unconscionably charged excessive overdraft fees, unlawfully and without contractual authority.

118. Plaintiff class members seek actual damages plus interest on damages at the legal rate, as well as all other just and proper relief afforded by the ADTPA.

119. Because Plaintiff class members seek to enforce an important right affecting the public interest, Plaintiffs request an award of attorneys' fees and costs on behalf of themselves and the class.

120. As a result of Defendant's violations of the Arkansas Deceptive Trade Practices Act prohibiting unfair and deceptive acts and practices, Plaintiffs and members of the Class have suffered monetary damages for which Defendants are liable.

## COUNT II - BREACH OF CONTRACT

121. Plaintiffs restate and reallege the preceding paragraphs of the Complaint as though set out here word for word.

122. Plaintiffs and members of the proposed Class have contracted with Iberia for bank account deposit, checking, ATM and debit card services, as memorialized in Iberia's Deposit Agreement and related documents.

123. Arkansas law imposes upon each party to contracts for banking services a duty of good faith and fair dealing.

124. Iberia's obfuscation of its intention to always resequence transactions from largest to smallest constitutes bad faith and unfair dealing in violation of the covenant of good faith and fair dealing.

26

125. Plaintiffs and members of the proposed Class have performed all, or substantially all, of their obligations under their agreements with Iberia.

126. Plaintiffs and members of the proposed class have sustained damages as a result of Iberia's breach of the covenant of good faith and fair dealing.

127. Plaintiff are entitled to an award of attorneys' fees on their contract claim pursuant to Ark. Code Ann. § 16-22-308.

## COUNT III - UNJUST ENRICHMENT

128. Plaintiffs restate and re-allege the preceding paragraphs of the Complaint as though set out here word for word.

129. Defendant withheld material terms and processes relating its Bounce Protection Privilege program from consumers prior to enrolling them in it, including the fact that Defendant would resequence transaction posting order to maximize the number of overdraft fees charged under the program.

130. Defendant knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the proposed Class.  Iberia acted with conscious disregard for the right of Plaintiffs and members of the proposed Class.

131. Defendant was unjustly enriched by the practice of withholding material terms of its Bounce Protection program prior to charging class members multiple overdraft fees for a single overdraft.

132. Defendant was unjustly enriched by the practice of resequencing posting of transactions from highest to lowest and increasing the number of overdraft fees charged.

27

133. It is inequitable for Iberia to retain and continue to receive benefits from the imposition of overdraft fees on Plaintiffs and members of the proposed Class that Iberia obtained in an unfair, unconscionable, and oppressive manner. Iberia's retention of such funds constitutes unjust enrichment.

134. As a result of Defendant's actions which constitute unjust enrichment, Plaintiffs and members of the proposed class suffered actual damages for which Defendant is liable. Defendant's liability for such damages should be measured by the extent of Defendant's unjust enrichment.

## COUNT IV - CONVERSION

135. Plaintiffs restate and reallege the preceding paragraphs of the Complaint as though set out here word for word.

136. Iberia had and continues to have a duty to maintain and preserve its customers' banking accounts and to prevent their diminishment through its own wrongful acts.

137. Iberia wrongfully collected overdraft fees from Plaintiffs and members of the proposed Class.

138. Iberia collected these fees by wrongfully taking specific and readily identifiable funds from their customers' bank accounts.

139. Iberia has assumed and exercised the right of ownership over these funds without any authorization to do so and in hostility to the rights of Plaintiffs and members of the proposed Class without legal justification.

140. Iberia retains these funds unlawfully without consent of Plaintiffs or

28

members of the proposed Class.

141. Iberia intends to permanently deprive Plaintiffs and members of the proposed Class of these funds.

142. Plaintiffs and members of the proposed Class properly own these funds, not Iberia, which now claims that it is entitled to their ownership contrary to the rights of Plaintiffs and members of the proposed Class.

143. Plaintiffs and members of the proposed Class are entitled to the immediate possession of these funds.

144. Iberia has wrongfully converted these specific and readily identifiable funds.

145. Iberia's wrongful conduct is of a continuing nature.

146. As a direct and proximate result of Iberia's wrongful conversion, Plaintiffs and members of the proposed Class have suffered and continue to suffer damages.

147. As a result of Iberia's actions constituting conversion, Plaintiffs and members of the proposed Class have suffered actual damages for which Defendant is liable. Defendant's liability should be measured by the extent of Iberia's conversion.

148. These wrongfully collected funds are specific and readily identifiable.

## COUNT V - INJUNCTIVE RELIEF

149. Plaintiffs restate and reallege the preceding paragraphs of the Complaint as though set out here word for word.

150. Plaintiffs ask the Court to grant the remedy of restitution to themselves and to all members of the class who made payments of excessive overdraft fees to

29

Iberia.

151. The Plaintiffs ask the Court to grant a refund of all overdraft fees paid to Iberia as a result of high-to-low posting.

152. Plaintiffs seek injunctive relief enjoining Iberia from continuing to engage in the fraudulent, deceitful, unlawful and unfair common scheme as alleged herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray:

A.    That the Court certify this action as a class action under Rule 23 of the Arkansas Rules of Civil Procedure, and find that Plaintiffs are proper class representatives, that counsel is adequate to represent the interests of the class, and that the best practicable notice of this action be given to members of the proposed Class;

B.    That judgment be entered against Defendant and in favor of Plaintiffs and the Class on Counts One through Five as alleged in this Complaint, for injunctive relief as requested herein, and for actual and compensatory damages in an amount to be determined at trial;

C.    That judgment be entered imposing interest on damages, litigation costs and attorneys' fees against the Defendant; and

D.    For all other and further relief as this Court may deem necessary and appropriate.

JURY DEMAND

Plaintiffs demand a trial by jury consisting of twelve persons on all issues so triable.

Dated this **18** day of February, 2011.

Respectfully Submitted,

Attorneys for Plaintiffs:

By:  _____

Jack Wagoner, AR Bar No. 89096
WAGONER LAW FIRM, P.A.
1320 Brookwood, Suite E
Little Rock, AR 72202
Telephone:  (501) 663-5225
Fax:  (501) 660-4030
Jack@wagonerlawfirm.com

and

Brent Walker, AR Bar No. 2002152
CARTER WALKER, PLLC
P.O. Box 628
Cabot, AR  72023
Telephone: (501) 605-1346
Fax: (501) 605-1348
bwalker@carterwalkerlaw.com

and

Steven A. Owings, AR Bar No. 89035
OWINGS LAW FIRM
1400 Brookwood
Little Rock, AR 72202
Telephone: (501) 661-9999
Fax: (501) 661-8393
sowings@owingslawfirm.com

31

DAVID J SACHAR
CHRISTINE M SACHAR
1216 BRIAR CREEK
LITTLE ROCK AR 72211

Date  6/16/10           Page    1
Account Number   @XXXXXXXXXX@7115

Deposit-To-Deposit Overdraft Protection is available with a daily transfer fee of
$5 effective 8/2/10. For more information, please contact your Relationship Banker.

-------------------------- CHECKING ACCOUNT --------------------------------

FREEDOM CHECKING
Account Number        @XXXXXXXXXX@7115   Statement Dates    5/19/10 thru  6/16/10
Previous Balance              1,382.22   Days this Statement Period           29
    4 Deposits/Credits        4,457.03   Average Ledger                 1,115.27
  163 Checks/Debits           5,513.25   Average Collected              1,089.41
Service Charge                     .00
Interest Paid                      .00
Current Balance                 326.00

|                                                                 | Total For This Period | Total Year-to-Date |
|-----------------------------------------------------------------|-----------------------|--------------------|
| Overdraft item fees year to date                                | $300.00               | $300.00            |
| Return item fees year to date                                   | $.00                  | $.00               |

### Deposits and Additions

| Date | Description | Amount |
|------|-------------|--------|
| 5/21 | DIRECT PAY STATE OF ARK PPD | 1,803.52 |
| 6/03 | Deposit | 750.00 |
| 6/04 | DIRECT PAY STATE OF ARK PPD | 1,803.51 |
| 6/15 | Deposit | 100.00 |

### Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
| 5/19 | POS DEBIT CHECKING KROGER          LITTLE ROCK  AR | 47.51- |

**EXHIBIT**

**1**

DAVID J SACHAR
CHRISTINE M SACHAR
1216 BRIAR CREEK
LITTLE ROCK AR 72211

Date  6/16/10          Page    2
Account Number   @XXXXXXXXXX@7115

FREEDOM CHECKING                @XXXXXXXXXX@7115   (Continued)

## Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
| 5/19 | POS DEBIT CHECKING | 19.35- |
|      | OLD NAVY USA   W. LITTLE RO AR | |
| 5/19 | POS DEBIT CHECKING | 13.44- |
|      | KROGER         LITTLE ROCK  AR | |
| 5/19 | POS DEBIT CHECKING | 10.94- |
|      | TROPICAL SMOOT LITTLE ROCK  AR | |
| 5/19 | POS DEBIT CHECKING | 10.21- |
|      | DAVES PLACE    LITTLE ROCK  AR | |
| 5/19 | POS DEBIT CHECKING | 9.91- |
|      | CHICK-FIL-A #0 LITTLE ROCK  AR | |
| 5/20 | POS DEBIT CHECKING | 43.26- |
|      | BUFFALO GRILL  LITTLE ROCK  AR | |
| 5/20 | POS DEBIT CHECKING | 33.76- |
|      | LA HACIENDA WE LITTLE ROCK  AR | |
| 5/20 | POS DEBIT CHECKING | 19.35- |
|      | CRACKERBOX 30  N LITTLE ROC AR | |
| 5/20 | POS DEBIT CHECKING | 9.71- |
|      | DAVES PLACE    LITTLE ROCK  AR | |
| 5/20 | POS DEBIT CHECKING | 3.59- |
|      | WENDYS  2      LITTLE ROCK  AR | |
| 5/21 | DEBIT CHECKING | 50.00- |
|      | 10901 RODNEY P LITTLE ROCK  AR | |
| 5/21 | POS DEBIT CHECKING | 48.62- |
|      | THE PURPLE COW LITTLE ROCK  AR | |
| 5/21 | POS DEBIT CHECKING | 10.00- |
|      | MARKET PLACE P LITTLE ROCK  AR | |
| 5/21 | POS DEBIT CHECKING | 9.44- |
|      | DAVES PLACE    LITTLE ROCK  AR | |
| 5/22 | POS DEBIT CHECKING | 75.22- |
|      | CNS ACADEMY LT LITTLE ROCK  AR | |
| 5/22 | POS DEBIT CHECKING | 48.19- |
|      | THE FADED ROSE LITTLE ROCK  AR | |
| 5/22 | POS DEBIT CHECKING | 33.96- |
|      | KMART          LITTLE ROCK  AR | |
| 5/22 | POS DEBIT CHECKING | 13.97- |
|      | SUBWAY         LITTLE ROCK  AR | |
| 5/22 | POS DEBIT CHECKING | 11.31- |
|      | THE CAPITAL HO LITTLE ROCK  AR | |

DAVID J SACHAR
CHRISTINE M SACHAR
1216 BRIAR CREEK
LITTLE ROCK AR 72211

Date  6/16/10        Page    3
Account Number   @XXXXXXXXXX@7115

FREEDOM CHECKING              @XXXXXXXXXX@7115   (Continued)

Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
| 5/22 | POS DEBIT CHECKING | 8.52- |
|      | TARGET T1114 L LITTLE ROCK  AR | |
| 5/22 | POS DEBIT CHECKING | 7.21- |
|      | SCHLOTZSHYS #  LITTLE RO     AR | |
| 5/23 | POS DEBIT CHECKING | 53.73- |
|      | ACADEMY SPORTS LITTLE ROCK  AR | |
| 5/23 | POS DEBIT CHECKING | 45.40- |
|      | SHELL Service  LITTLE ROCK  AR | |
| 5/23 | POS DEBIT CHECKING | 25.00- |
|      | CRACKERBOX 46  LITTLE ROCK  AR | |
| 5/23 | POS DEBIT CHECKING | 18.26- |
|      | BEST BUY #275  LITTLE ROCK  AR | |
| 5/23 | POS DEBIT CHECKING | 16.91- |
|      | TACO BELL 301  LITTLE ROCK  AR | |
| 5/23 | POS DEBIT CHECKING | 9.55- |
|      | BARNESNOBLE     Little Rock  AR | |
| 5/23 | POS DEBIT CHECKING | 6.58- |
|      | SUBWAY         LITTLE ROCK  AR | |
| 5/24 | POS DEBIT CHECKING | 60.15- |
|      | SPORTS AUTHORI LITTLE       AR | |
| 5/24 | POS DEBIT CHECKING | 60.07- |
|      | YA YAS LITTLE  LITTLE ROCK  AR | |
| 5/24 | POS DEBIT CHECKING | 36.82- |
|      | FRESH MKT-077  LITTLE ROCK  AK | |
| 5/24 | POS DEBIT CHECKING | 12.52- |
|      | BARNESNOBLE     Little Rock  AR | |
| 5/24 | POS DEBIT CHECKING | 8.74- |
|      | TROPICAL SNOOT LITTLE ROCK  AR | |
| 5/24 | POS DEBIT CHECKING | 7.33- |
|      | SUBWAY         LITTLE ROCK  AR | |
| 5/25 | POS DEBIT CHECKING | 3.07- |
|      | SHELL Service  LITTLE ROCK  AR | |
| 5/26 | POS DEBIT CHECKING | 32.24- |
|      | KOHL'S #0696 1 LITTLE ROCK  AR | |
| 5/26 | POS DEBIT CHECKING | 21.16- |
|      | AMERICAN PIE P N LITTLE ROC AR | |
| 5/26 | POS DEBIT CHECKING | 16.23- |
|      | COPELANDS OF L LITTLE ROCK  AR | |

DAVID J SACHAR                          Date  6/16/10           Page    4
CHRISTINE M SACHAR                      Account Number   @XXXXXXXXXX@7115
1216 BRIAR CREEK
LITTLE ROCK AR 72211


FREEDOM CHECKING                    @XXXXXXXXXX@7115   (Continued)

### Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
| 5/26 | POS DEBIT CHECKING<br>TROPICAL SMOOT LITTLE ROCK  AR | 12.02- |
| 5/26 | POS DEBIT CHECKING<br>SAN FRANCISCO  LITTLE ROCK  AR | 11.65- |
| 5/26 | POS DEBIT CHECKING<br>BARNESNOBLE     Little Rock  AR | 10.35- |
| 5/26 | POS DEBIT CHECKING<br>SAN FRANCISCO  LITTLE ROCK  AR | 10.00- |
| 5/26 | POS DEBIT CHECKING<br>BARNESNOBLE     Little Rock  AR | 8.21- |
| 5/26 | POS DEBIT CHECKING<br>SUDS #2         LITTLE ROCK  AR | 6.00- |
| 5/26 | POS DEBIT CHECKING<br>DAVES PLACE     LITTLE ROCK  AR | 5.93- |
| 5/26 | POS DEBIT CHECKING<br>BARNESNOBLE     Little Rock  AR | 4.13- |
| 5/27 | PAYMENT FROM CHECKING<br>9601 S MERIDIA 800-894-9131 CO | 73.46- |
| 5/27 | POS DEBIT CHECKING<br>TARGET T1114 L LITTLE ROCK  AR | 40.33- |
| 5/27 | POS DEBIT CHECKING<br>LAYLA`S # 1     LITTLE ROCK  AR | 28.72- |
| 5/27 | POS DEBIT CHECKING<br>WAL SAM'S Club LITTLE ROCK  AR | 21.62- |
| 5/27 | POS DEBIT CHECKING<br>EL PORTON MEXI LITTLE ROCK  AR | 15.00- |
| 5/27 | POS DEBIT CHECKING<br>MCDONALD'S F29 LITTLE ROCK  AR | 10.95- |
| 5/27 | POS DEBIT CHECKING<br>CHICK-FIL-A #0 LITTLE ROCK  AR | 5.19- |
| 5/28 | Bill Pay   Entergy Services<br>WEB | 111.40- |
| 5/28 | POS DEBIT CHECKING<br>FRESH MKT-077  LITTLE ROCK  AK | 44.96- |
| 5/28 | POS DEBIT CHECKING<br>JASON`S DELI - LITTLE ROCK  AR | 18.46- |
| 5/29 | POS DEBIT CHECKING<br>TARGET T1114 L LITTLE ROCK  AR | 177.15- |

DAVID J SACHAR
CHRISTINE M SACHAR
1216 BRIAR CREEK
LITTLE ROCK AR 72211

Date  6/16/10                     Page    5
Account Number    @XXXXXXXXXX@7115

FREEDOM CHECKING                          @XXXXXXXXXX@7115   (Continued)

## Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
| 5/29 | POS DEBIT CHECKING | 112.64- |
|      | BEST BUY #275   LITTLE ROCK  AR | |
| 5/29 | PAYMENT FROM CHECKING | 93.88- |
|      | CENTRAL ARKANS 501-372-5161 AR | |
| 5/29 | POS DEBIT CHECKING | 81.00- |
|      | TLF*SEARCY FLO 501-2680240   AR | |
| 5/29 | POS DEBIT CHECKING | 60.35- |
|      | KMART          LITTLE ROCK  AR | |
| 5/29 | POS DEBIT CHECKING | 41.80- |
|      | SHELL Service  LITTLE ROCK  AR | |
| 5/29 | POS DEBIT CHECKING | 26.83- |
|      | CNS ACADEMY LT LITTLE ROCK  AR | |
| 5/29 | POS DEBIT CHECKING | 21.92- |
|      | WAL Wal-Mart S LITTLE ROCK  AR | |
| 5/29 | POS DEBIT CHECKING | 11.24- |
|      | BOOKS & BRUINS LITTLE ROCK  AR | |
| 5/30 | POS DEBIT CHECKING | 105.96- |
|      | GANDER MOUNTAI SHERWOOD     AR | |
| 5/30 | POS DEBIT CHECKING | 76.97- |
|      | MACARONI GRILL LITTLE ROCK  AR | |
| 5/30 | POS DEBIT CHECKING | 50.28- |
|      | BARNESNOBLE    Little Rock  AR | |
| 5/30 | POS DEBIT CHECKING | 40.32- |
|      | CHEEBURGER CHE LITTLE ROCK  AR | |
| 5/30 | POS DEBIT CHECKING | 20.36- |
|      | WALGREEN COMPA LITTLE ROCK  AR | |
| 5/30 | POS DEBIT CHECKING | 8.63- |
|      | COLDSTONE #112 LITTLE ROCK  AR | |
| 5/30 | POS DEBIT CHECKING | 7.98- |
|      | SUBWAY         LITTLE ROCK  AR | |
| 5/30 | Paid Item Fee | 30.00- |
| 5/31 | POS DEBIT CHECKING | 73.58- |
|      | LOCA LUNA      LITTLE ROCK  AR | |
| 5/31 | POS DEBIT CHECKING | 68.83- |
|      | SEKISUI SUSHI  LITTLE ROCK  AR | |
| 5/31 | POS DEBIT CHECKING | 19.99- |
|      | EXXONMOBIL     ARKADELP    AR | |

DAVID J SACHAR
CHRISTINE M SACHAR
1216 BRIAR CREEK
LITTLE ROCK AR 72211

Date  6/16/10                 Page    6
Account Number   @XXXXXXXXXX@7115


FREEDOM CHECKING                @XXXXXXXXXX@7115   (Continued)

## Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
| 6/01 | POS DEBIT CHECKING | 22.98- |
|      | WALGREEN COMPA LITTLE ROCK  AR | |
| 6/01 | POS DEBIT CHECKING | 14.13- |
|      | KMART          LITTLE ROCK  AR | |
| 6/01 | POS DEBIT CHECKING | 12.88- |
|      | POPEYES #4015  LITTLE ROCK  AR | |
| 6/01 | POS DEBIT CHECKING | 8.28- |
|      | TROPICAL SMOOT LITTLE ROCK  AR | |
| 6/01 | Paid Item Fee | 30.00- |
| 6/01 | POS DEBIT CHECKING | 7.33- |
|      | COLDSTONE #112 LITTLE ROCK  AR | |
| 6/01 | Paid Item Fee | 30.00- |
| 6/01 | POS DEBIT CHECKING | 6.02- |
|      | SUBWAY         LITTLE ROCK  AR | |
| 6/01 | Paid Item Fee | 30.00- |
| 6/01 | POS DEBIT CHECKING | 6.00- |
|      | SUDS #2        LITTLE ROCK  AR | |
| 6/01 | Paid Item Fee | 30.00- |
| 6/02 | POS DEBIT CHECKING | 55.80- |
|      | COPELANDS OF L LITTLE ROCK  AR | |
| 6/02 | Paid Item Fee | 30.00- |
| 6/02 | POS DEBIT CHECKING | 53.75- |
|      | BEST CAR WASH  LITTLE ROCK  AR | |
| 6/02 | Paid Item Fee | 30.00- |
| 6/02 | POS DEBIT CHECKING | 36.77- |
|      | SAMURAI JAPANE LITTLE ROCK  AR | |
| 6/02 | Paid Item Fee | 30.00- |
| 6/02 | POS DEBIT CHECKING | 30.00- |
|      | H2O HAIR & COL LITTLE ROCK  AR | |
| 6/02 | Paid Item Fee | 30.00- |
| 6/02 | PAYMENT FROM CHECKING | 2.95- |
|      | CENTRAL ARKANS 501-372-5161 AR | |
| 6/02 | Paid Item Fee | 30.00- |
| 6/03 | POS DEBIT CHECKING | 40.00- |
|      | KROGER         LITTLE ROCK  AR | |
| 6/03 | POS DEBIT CHECKING | 20.00- |
|      | SUPERSTOP #104 BRYANT      AR | |

```
DAVID J SACHAR                    Date  6/16/10            Page   7
CHRISTINE M SACHAR                Account Number    @XXXXXXXXXX@7115
1216 BRIAR CREEK
LITTLE ROCK AR 72211
```

FREEDOM CHECKING                     @XXXXXXXXXX@7115   (Continued)

## Withdrawals and Deductions

| Date | Description | | Amount |
|------|-------------|--|--------|
| 6/03 | POS DEBIT CHECKING | | 9.55- |
|      | BUNK 1          NEW YORK      NY | | |
| 6/03 | POS DEBIT CHECKING | | 9.44- |
|      | DAVES PLACE     LITTLE ROCK  AR | | |
| 6/03 | POS DEBIT CHECKING | | 6.00- |
|      | SUDS #2         LITTLE ROCK  AR | | |
| 6/04 | POS DEBIT CHECKING | | 58.44- |
|      | KOHL'S #0696 1 LITTLE ROCK  AR | | |
| 6/04 | POS DEBIT CHECKING | | 46.67- |
|      | FARMERS ASSOCI LITTLE ROCK  AR | | |
| 6/04 | POS DEBIT CHECKING | | 9.71- |
|      | DAVES PLACE     LITTLE ROCK  AR | | |
| 6/04 | POS DEBIT CHECKING | | 2.57- |
|      | CRACKERBOX 46  LITTLE ROCK  AR | | |
| 6/05 | POS DEBIT CHECKING | | 61.59- |
|      | JAHNA'S         HOT SPRINGS  AR | | |
| 6/05 | POS DEBIT CHECKING | | 25.91- |
|      | DILLARDS - 040 HOT SPRINGS  AR | | |
| 6/05 | POS DEBIT CHECKING | | 7.55- |
|      | RADIO SHACK     HOT SPRINGS  AR | | |
| 6/05 | POS DEBIT CHECKING | | 2.11- |
|      | SUPERSTOP 132  ARKADELPHIA  AR | | |
| 6/06 | POS DEBIT CHECKING | | 50.27- |
|      | TARGET T1114 L LITTLE ROCK  AR | | |
| 6/06 | POS DEBIT CHECKING | | 29.30- |
|      | DRUG EMPORIUM  LITTLE ROCK  AR | | |
| 6/06 | POS DEBIT CHECKING | | 27.98- |
|      | BEST BUY #275  LITTLE ROCK  AR | | |
| 6/06 | POS DEBIT CHECKING | | 23.79- |
|      | JIMS RAZORBACK LITTLE ROCK  AR | | |
| 6/06 | POS DEBIT CHECKING | | 20.12- |
|      | KFC  #535027   LITTLE ROCK  AR | | |
| 6/06 | POS DEBIT CHECKING | | 8.00- |
|      | SUDS #2         LITTLE ROCK  AR | | |
| 6/07 | POS DEBIT CHECKING | | 59.61- |
|      | KROGER          LITTLE ROCK  AR | | |
| 6/07 | DEBIT CHECKING | | 50.00- |
|      | 10901 RODNEY P LITTLE ROCK  AR | | |

DAVID J SACHAR                    Date  6/16/10          Page    8
CHRISTINE M SACHAR               Account Number   @XXXXXXXXX@7115
1216 BRIAR CREEK
LITTLE ROCK AR 72211

FREEDOM CHECKING                @XXXXXXXXX@7115   (Continued)

### Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
| 6/07 | POS DEBIT CHECKING | 23.07- |
|      | FRANKE'S CAFET LITTLE ROCK  AR | |
| 6/07 | POS DEBIT CHECKING | 7.96- |
|      | WALGREEN COMPA LITTLE ROCK  AR | |
| 6/07 | POS DEBIT CHECKING | 6.85- |
|      | MIDLAND HEIGHT HELENA        AR | |
| 6/08 | POS DEBIT CHECKING | 55.58- |
|      | LONE STAR-LITT LITTLE ROCK  AR | |
| 6/08 | POS DEBIT CHECKING | 35.01- |
|      | KROGER          LITTLE ROCK  AR | |
| 6/08 | POS DEBIT CHECKING | 10.00- |
|      | SHELL Service  LITTLE ROCK  AR | |
| 6/08 | POS DEBIT CHECKING | 7.48- |
|      | WENDYS #0114   WEST HELENA  AR | |
| 6/08 | POS DEBIT CHECKING | 3.33- |
|      | CRACKERBOX 30  N LITTLE ROC AR | |
| 6/09 | POS DEBIT CHECKING | 28.86- |
|      | KROGER          LITTLE ROCK  AR | |
| 6/09 | POS DEBIT CHECKING | 18.02- |
|      | PANERA BREAD # LITTLE ROCK  AR | |
| 6/09 | POS DEBIT CHECKING | 7.33- |
|      | SUBWAY          LITTLE ROCK  AR | |
| 6/09 | POS DEBIT CHECKING | 6.00- |
|      | SUDS #2         LITTLE ROCK  AR | |
| 6/09 | POS DEBIT CHECKING | 5.42- |
|      | EXXONMOBIL      BRINKLEY     AR | |
| 6/09 | POS DEBIT CHECKING | 4.09- |
|      | BARTON STOP &   BARTON      AR | |
| 6/10 | POS DEBIT CHECKING | 68.22- |
|      | THE VILLA ITAL LITTLE ROCK  AR | |
| 6/11 | POS DEBIT CHECKING | 75.90- |
|      | TARGET T1114 L LITTLE ROCK  AR | |
| 6/11 | DEBIT CHECKING | 25.00- |
|      | 10901 RODNEY P LITTLE ROCK  AR | |
| 6/11 | POS DEBIT CHECKING | 21.15- |
|      | SUBWAY          LITTLE ROCK  AR | |
| 6/11 | POS DEBIT CHECKING | 5.76- |
|      | WALGREEN COMPA HOT SPRINGS  AR | |

DAVID J SACHAR
CHRISTINE M SACHAR
1216 BRIAR CREEK
LITTLE ROCK AR 72211

Date  6/16/10          Page   9
Account Number    @XXXXXXXXXX@7115

FREEDOM CHECKING                    @XXXXXXXXXX@7115  (Continued)

## Withdrawals and Deductions

| Date | Description | Amount |
|------|-------------|--------|
| 6/12 | POS DEBIT CHECKING | 42.48- |
|      | IGIBON JAPANES LITTLE ROCK  AR | |
| 6/13 | POS DEBIT CHECKING | 17.30- |
|      | CHICK-FIL-A #0 LITTLE ROCK  AR | |
| 6/14 | POS DEBIT CHECKING | 111.09- |
|      | JONES & SON FI LITTLE ROCK  AR | |
| 6/14 | POS DEBIT CHECKING | 45.88- |
|      | GINA'S CHINESE LITTLE ROCK  AR | |
| 6/14 | POS DEBIT CHECKING | 44.87- |
|      | OUTBACK #0412  LITTLE ROCK  AR | |
| 6/14 | POS DEBIT CHECKING | 36.45- |
|      | WALGREEN COMPA LITTLE ROCK  AR | |
| 6/14 | POS DEBIT CHECKING | 32.78- |
|      | SAMSCLUB #8104 LITTLE ROCK  AR | |
| 6/14 | POS DEBIT CHECKING | 20.99- |
|      | JIMS RAZORBACK LITTLE ROCK  AR | |
| 6/14 | POS DEBIT CHECKING | 18.50- |
|      | UA BRECKENRIDG LITTLE ROCK  AR | |
| 6/14 | POS DEBIT CHECKING | 16.50- |
|      | UA BRECKENRIDG LITTLE ROCK  AR | |
| 6/14 | POS DEBIT CHECKING | 9.38- |
|      | LA HACIENDA WE LITTLE ROCK  AR | |
| 6/14 | POS DEBIT CHECKING | 7.00- |
|      | SUDS #2        LITTLE ROCK  AR | |
| 6/14 | POS DEBIT CHECKING | 5.59- |
|      | COLDSTONE #112 LITTLE ROCK  AR | |
| 6/15 | POS DEBIT CHECKING | 40.00- |
|      | EXXONMOBIL     LITTLE R    AR | |
| 6/15 | POS DEBIT CHECKING | 6.95- |
|      | MCALLISTERS DE LITTLE ROCK  AR | |
| 6/16 | POS DEBIT CHECKING | 36.54- |
|      | BEST CAR WASH  LITTLE ROCK  AR | |
| 6/16 | POS DEBIT CHECKING | 9.71- |
|      | DAVES PLACE    LITTLE ROCK  AR | |

```
DAVID J SACHAR                    Date  6/16/10              Page   10
CHRISTINE M SACHAR               Account Number      @XXXXXXXXXX@7115
1216 BRIAR CREEK
LITTLE ROCK AR 72211
```

FREEDOM CHECKING                 @XXXXXXXXXX@7115   (Continued)

### Checks in Number Order

| Date | Check No | Amount | Date | Check No | Amount | Date | Check No | Amount |
|------|----------|--------|------|----------|--------|------|----------|--------|
| 6/04 | 6075 | 15.00 | 5/24 | 6083 | 180.50 | 6/07 | 6086 | 90.30 |
| 5/20 | 6078* | 225.00 | 6/01 | 6084 | 90.30 | 6/14 | 6087 | 228.91 |
| 5/27 | 6082* | 41.08 | 6/01 | 6085 | 90.30 | | | |

(*) Check Numbers Missing

### Daily Balance Information

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 5/19 | 1,270.86 | 5/29 | 702.74 | 6/08 | 1,222.67 |
| 5/20 | 936.19 | 5/30 | 362.24 | 6/09 | 1,152.95 |
| 5/21 | 2,621.65 | 5/31 | 199.84 | 6/10 | 1,084.73 |
| 5/22 | 2,423.27 | 6/01 | 178.38- | 6/11 | 956.92 |
| 5/23 | 2,247.84 | 6/02 | 507.65- | 6/12 | 914.44 |
| 5/24 | 1,881.71 | 6/03 | 157.36 | 6/13 | 897.14 |
| 5/25 | 1,878.64 | 6/04 | 1,828.48 | 6/14 | 319.20 |
| 5/26 | 1,740.72 | 6/05 | 1,731.32 | 6/15 | 372.25 |
| 5/27 | 1,504.37 | 6/06 | 1,571.86 | 6/16 | 326.00 |
| 5/28 | 1,329.55 | 6/07 | 1,334.07 | | |

------------------------------ DEBIT CARD -----------------------------------

| Card Number | Reward Points | As Of |
|-------------|---------------|-------|
| ***********1943 | 8,288 | 4/30/10 |
| ***********0907 | 17,842 | 4/30/10 |

**YOUR DEPOSIT ACCOUNT TERMS AND CONDITIONS**

**AGREEMENT** - This document, along with any other documents we give you pertaining to your account(s), is a contract that establishes rules which control your account(s) with us. Please read this carefully. If you sign the signature card or open or continue to have your account with us, you agree to these rules. You will receive a separate schedule of rates, qualifying balances, and fees if they are not included in this document. If you have any questions, please call us.

This agreement is subject to applicable federal laws and the laws of the state of Arkansas (except to the extent that this agreement can and does vary such rules or laws). The body of state and federal law that governs our relationship with you, however, is too large and complex to be reproduced here. The purpose of this document is to:

(1) summarize some laws that apply to common transactions;

(2) establish rules to cover transactions or events which the law does not regulate;

(3) establish rules for certain transactions or events which the law regulates but permits variation by agreement; and

(4) give you disclosures of some of our policies to which you may be entitled or in which you may be interested.

If any provision of this document is found to be unenforceable according to its terms, all remaining provisions will continue in full force and effect. We may permit some variations from our standard agreement, but we must agree to any variation in writing either on the signature card for your account or in some other document.

As used in this document the words "we", "our", and "us" mean the financial institution and the words "you" and "your" mean the account holder(s) and anyone else with the authority to deposit, withdraw, or exercise control over the funds in the account. The headings in this document are for convenience or reference only and will not govern the interpretation of the provisions. Unless it would be inconsistent to do so, words and phrases used in this document should be construed so the singular includes the plural and the plural includes the singular.

**LIABILITY** - You agree, for yourself (and the person or entity you represent if you sign as a representative of another) to the terms of this account and the schedule of charges. You authorize us to deduct these charges directly from the account balance as accrued. You will pay any additional reasonable charges for services you request which are not covered by this agreement.

Each of you also agrees to be jointly and severally (individually) liable for any account shortage resulting from charges or overdrafts, whether caused by you or another with access to this account. This liability is due immediately, and can be deducted directly from the account balance whenever sufficient funds are available. You have no right to defer payment of this liability, and you are liable regardless of whether you signed the item or benefited from the charge or overdraft. This includes liability for our costs to collect the deficit including, to the extent permitted by law, our reasonable attorneys' fees.

**DEPOSITS** - We will give only provisional credit until collection is final for any items, other than cash, we accept for deposit (including items drawn "on us"). Actual credit for deposits of, or payable in, foreign currency will be at the exchange rate in effect on final collection in U.S. dollars. We are not responsible for transactions by mail or outside depository until we actually record them. We will treat and record all transactions received after our "daily cutoff time" on a business day we are open, or received on a day we are not open for business, as if initiated on the next following business day that we are open.

**WITHDRAWALS** - Unless clearly indicated otherwise on the account records, any of you, acting alone, who signs in the space designated for signatures on the signature card may withdraw or transfer all or any part of the account balance at any time. Each of you (until we receive written notice to the contrary) authorizes each other person signing the signature card to indorse any item payable to you or your order for deposit to this account or any other transaction with us. We may charge your account for a check even though payment was made before the date of the check, unless we have received written notice of the postdating in time to have a reasonable opportunity to act. We may refuse any withdrawal or transfer request which you

attempt on forms not approved by us, by any method we do not specifically permit, which is greater in number than the frequency permitted, or which is for an amount greater or less than any withdrawal limitations. Even if we honor a nonconforming request, we may treat continued abuse of the stated limitations (if any) as your act of closing the account. We will use the date the transaction is completed by us (as opposed to the date you initiate it) to apply the frequency limitations. The fact that we may honor withdrawal requests that overdraw the available account balance does not obligate us to do so later. See the funds availability policy disclosure for information about when you can withdraw funds you deposit. For those accounts for which our funds availability policy disclosure does not apply, you can ask us when you make a deposit when those funds will be available for withdrawal.

We may require not less than 7 days' notice in writing before each withdrawal from an interest-bearing account other than a time deposit, or from any other savings account as defined by Regulation D. Withdrawals from a time account prior to maturity or prior to any notice period may be restricted and may be subject to penalty. See your notice of penalty for early withdrawal.

**OWNERSHIP OF ACCOUNT AND BENEFICIARY DESIGNATION** - These rules apply to this account depending on the form of ownership and beneficiary designation, if any, specified on the account records. We make no representations as to the appropriateness or effect of the ownership and beneficiary designations, except as they determine to whom we pay the account funds. **Individual Account** - is an account in the name of one person. **Joint Account - With Survivorship (And Not As Tenants In Common)** - is an account in the name of two or more persons. Each of you intend that when you die the balance in the account (subject to any previous pledge to which we have agreed) will belong to the survivor(s). If two or more of you survive, you will own the balance in the account as joint tenants with survivorship and not as tenants in common. **Joint Account - No Survivorship (As Tenants In Common)** - is owned by two or more persons, but none of you intend (merely by opening this account) to create any right of survivorship in any other person. We encourage you to agree and tell us in writing of the percentage of the deposit contributed by each of you. This information will not, however, affect the "number of signatures" necessary for withdrawal. **Pay-On-Death Account** - If two or more of you create such an account, you own the account jointly with survivorship. Beneficiaries cannot withdraw unless: (1) all persons creating the account die, and (2) the beneficiary is then living. If two or more beneficiaries are named and survive the death of all persons creating the account, such beneficiaries will own this account in equal shares, with right of survivorship. The person(s) creating this account type reserves the right to: (1) change beneficiaries, (2) change account types, and (3) withdraw all or part of the account funds at any time.

**BUSINESS ACCOUNTS** - Earnings in the form of interest, dividends, or credits will be paid only on collected funds, unless otherwise provided by law or our policy. We may require the governing body of the legal entity opening the account to give us a separate authorization telling us who is authorized to act on its behalf. We will honor the authorization until we actually receive written notice of a change from the governing body of the legal entity.

**STOP PAYMENTS** - You must make any stop-payment order in the manner required by law and we must receive it in time to give us a reasonable opportunity to act on it before our stop-payment cutoff time. To be effective, your stop-payment order must precisely identify the number, date and amount of the item, and the payee.

You may stop payment on any item drawn on your account whether you sign the item or not, if you have an equal or greater right to withdraw from this account than the person who signed the item. A release of the stop-payment request may be made only by the person who initiated the stop-payment order.

Our stop-payment cutoff time is one hour after the opening of the next banking day after the banking day on which we receive the item. Additional limitations on our obligation to stop payment are provided by law (e.g., we _____ certified the item).

**EXHIBIT**

**2**

*(page 1 of 2)*

Experi, ©1983, 1990, 1991, 1993 Bankers Systems, Inc., St. Cloud, MN  Form TC-AR 7/21/2000

**TELEPHONE TRANSFERS** - A telephone transfer of funds from this account to another account with us, if otherwise arranged for or permitted, may be made by the same persons and under the same conditions generally applicable to withdrawals made in writing. Unless a different limitation is disclosed in writing, we restrict the number of transfers from a savings account to another account or to third parties, to a maximum of six per month (less the number of "preauthorized transfers" during the month). Other account transfer restrictions may be described elsewhere.

**AMENDMENTS AND TERMINATION** - We may change any term of this agreement. Rules governing changes in interest rates are provided separately. For other changes, we will give you reasonable notice in writing or by any other method permitted by law. We may also close this account at any time upon reasonable notice to you and tender of the account balance personally or by mail. Notice from us to any one of you is notice to all of you.

**STATEMENTS** - You must examine your statement of account with "reasonable promptness." If you discover (or reasonably should have discovered) any unauthorized signatures or alterations, you must promptly notify us of the relevant facts. As between you and us, if you fail to do either of these duties, you will have to either share the loss with us, or bear the loss entirely yourself (depending on whether we used ordinary care and, if not, whether we substantially contributed to the loss). The loss could be not only with respect to items on the statement but other items with unauthorized signatures or alterations by the same wrongdoer.

You agree that the time you have to examine your statement and report to us will depend on the circumstances, but will not, in any circumstance, exceed a total of 30 days from when the statement is first sent or made available to you.

You further agree that if you fail to report any unauthorized signatures, alterations, forgeries, or any other errors in your account within 60 days of when we first send or make the statement available, you cannot assert a claim against us on any items in that statement, and as between you and us the loss will be entirely yours. This 60-day limitation is without regard to whether we used ordinary care. The limitation in this paragraph is in addition to that contained in the first paragraph of this section.

**ACCOUNT TRANSFER** - This account may not be transferred or assigned without our prior written consent.

**DIRECT DEPOSITS** - If, in connection with a direct deposit plan, we deposit any amount in an account which should have been returned to the Federal Government for any reason, you authorize us to deduct the amount of our liability to the Federal Government from the account or from any other account you have with us, without prior notice and at any time, except as prohibited by law. We may also use any other legal remedy to recover the amount of our liability.

**TEMPORARY ACCOUNT AGREEMENT** - If this option is selected, this is a temporary account agreement. Each person who signs in the space designated for signatures on the signature card (except as indicated to the contrary) may transact business on this account. However, we may at some time in the future restrict or prohibit further use of this account if you fail to comply with the requirements we have imposed within a reasonable time.

**SETOFF** - We may (without prior notice and when permitted by law) set off the funds in this account against any due and payable debt you owe us now or in the future, by any of you having the right of withdrawal, to the extent of such persons' or legal entity's right to withdraw. If the debt arises from a note, "any due and payable debt" includes the total amount of which we are entitled to demand payment under the terms of the note at the time we set off, including any balance the due date for which we properly accelerate under the note.

This right of setoff does not apply to this account if: (a) it is an IRA or other tax-deferred retirement account, or (b) the debt is created by a consumer credit transaction under a credit card plan (but this does not affect our rights under any consensual security interest), or (c) the debtor's right of withdrawal only arises in a representative capacity. We will not be liable for the dishonor of any check when the dishonor occurs because we set off a debt against this account. You agree to hold us harmless from any claim arising as a result of our exercise of our right of setoff.

**AGENCY (Power of Attorney) DESIGNATION** - A single individual is the owner. The agent is merely designated to conduct transactions on the owner's behalf. We undertake no obligation to monitor transactions to determine that they are on the owner's behalf.

**RESTRICTIVE LEGENDS** - We are not required to honor any restrictive legend on checks you write unless we have agreed in writing to the restriction. Examples of restrictive legends are "must be presented within 90 days" or "not valid for more than $1,000.00."

**ACH AND WIRE TRANSFERS** - This agreement is subject to Article 4A of the Uniform Commercial Code - Fund Transfers as adopted in the state in which you have your account with us. If you originate a fund transfer for which Fedwire is used, and you identify by name and number a beneficiary financial institution, an intermediary financial institution or a beneficiary, we and every receiving or beneficiary financial institution may rely on the identifying number to make payment. We may rely on the number even if it identifies a financial institution, person or account other than the one named. You agree to be bound by automated clearing house association rules. These rules provide, among other things, that payments made to you, or originated by you, are provisional until final settlement is made through a Federal Reserve Bank or payment is otherwise made as provided in Article 4A-403(a) of the Uniform Commercial Code. If we do not receive such payment, we are entitled to a refund from you in the amount credited to your account and the party originating such payment will not be considered to have paid the amount so credited. If we receive a credit to an account you have with us by wire or ACH, we are not required to give you any notice of the payment order or credit.

**FACSIMILE SIGNATURES** - You authorize us, at any time, to charge you for all checks, drafts, or other orders, for the payment of money, that are drawn on us regardless of by whom or by what means the facsimile signature(s) may have been affixed so long as they resemble the facsimile signature specimen filed with us, and contain the required number of signatures for this purpose.

**PLEDGES** - Unless we agree otherwise in writing, each owner of this account may pledge all or any part of the funds in it for any purpose to which we agree. Any pledge of this account must first be satisfied before the rights of any surviving account owner or account beneficiary become effective.

Exⁱpere, ©1983, 1990, 1991, 1993 Bankers Systems, Inc., St. Cloud, MN Form TC-AR 7/21/2000

# ● ELECTRONIC FUND TRANSFERS ●
### YOUR RIGHTS AND RESPONSIBILITIES

The Electronic Fund Transfers we are capable of handling for consumers are indicated below, some of which may not apply to your account. Some of these may not be available at all terminals. Please read this disclosure carefully because it tells you your rights and obligations for these transactions. You should keep this notice for future reference.

## TYPES OF TRANSFERS, FREQUENCY AND DOLLAR LIMITATIONS

☒ **(a)  Prearranged Transfers.**
- ☒ **Preauthorized credits.** You may make arrangements for certain direct deposits to be accepted into your ☒ checking and/or ☒ savings account(s).
- ☒ **Preauthorized payments.** You may make arrangements to pay certain recurring bills from your ☒ checking and/or ☒ savings account(s).
- ☐ _____

☒ **(b)  Telephone Transfers.** You may access your account(s) by telephone at <u>(800)564-5299 or (501)661-7300</u> using a touch tone phone, your account numbers, and <u>Personal Identification Number (PIN)</u> to:
- ☒ Transfer funds from checking to savings
- ☒ Transfer funds from savings to checking
- ☐ Transfer funds from _____
  to _____
- ☐ Transfer funds from _____
  to _____
- ☒ Make payments from checking to loan accounts with us
- ☐ Make payments from _____
  to _____
- ☐ Make payments from _____
  to _____
- ☒ Get checking account(s) information
- ☒ Get savings account(s) information
- ☒ <u>Get loan account(s) information</u>
- ☒ <u>Make bill payments from checking or savings.  Receive statement by fax.</u>

☒ **(c)  ATM Transfers.** You may access your account(s) by ATM using your <u>ATM /Debit VISA Card</u> _____ and personal identification number to:
- ☒ Make deposits to checking accounts
- ☒ Make deposits to savings accounts
- ☒ Get cash withdrawals from checking accounts you may withdraw no more than <u>$500.00</u>per <u>day</u>
- ☒ Get cash withdrawals from savings accounts you may withdraw no more than <u>$500.00</u>per <u>day</u>
- ☒ Transfer funds from savings to checking
- ☒ Transfer funds from checking to savings
- ☐ Transfer funds from _____
  to _____
- ☐ Make payments from checking account to _____

- ☐ Make payments from _____
  to _____
- ☒ Get checking account(s) information
- ☒ Get savings account(s) information
- ☐ _____
  _____
- ☐ _____
  _____

☒ **(d)  Point-Of-Sale Transactions.**
Using your card:
- ☒ You may access your ☒ checking account
  ☐ _____ account(s) to purchase goods (☒ in person, ☒ by phone, ☒ by computer), pay for services (☐ in person, ☒ by phone, ☒ by computer), get cash from a merchant, if the merchant permits, or from a participating financial institution, and do anything that a participating merchant will accept.
- ☒ You may not exceed more than $ <u>2,500.00</u>  in transactions per <u>day</u>  .
- ☐ _____
- ☐ _____

☒ **(e)  Computer Transfers.** You may access your account(s) by computer by _____
_____ and using your
<u>login ID, and password</u> _____ to:
- ☒ Transfer funds from checking to savings
- ☒ Transfer funds from savings to checking
- ☐ Transfer funds from _____
  to _____
- ☐ Transfer funds from _____
  to _____
- ☒ Make payments from checking to loan accounts with us
- ☒ Make payments from <u>savings</u>
  to <u>loan account(s)</u>
- ☐ Make payments from _____
  to _____
- ☒ Get checking account(s) information
- ☒ Get savings account(s) information
- ☒ <u>Make bill payments from your checking or savings account(s)</u>
- ☒ <u>Get loan account(s) information</u>
- _____

Electronic Fund Transfers Disclosure
Bankers Systems ™
Wolters Kluwer Financial Services © 1980, 2007



EXHIBIT

3

☒ **(f) Electronic Fund Transfers Initia●d By Third Parties.** You may authorize a third party to initiate electronic fund transfers between your account and the third party's account. These transfers to make or receive payment may be one-time occurrences or may recur as directed by you. These transfers may use the Automated Clearing House (ACH) or other payments network. Your authorization to the third party to make these transfers can occur in a number of ways. For example, your authorization to convert a check to an electronic fund transfer or to electronically pay a returned check charge can occur when a merchant provides you with notice and you go forward with the transaction (typically, at the point of purchase, a merchant will post a sign and print the notice on a receipt). In all cases, these third party transfers will require you to provide the third party with your account number and financial institution information. This information can be found on your check as well as on a deposit or withdrawal slip. Thus, you should only provide your financial institution account information (whether over the phone, the Internet, or via some other method) to trusted third parties whom you have authorized to initiate these electronic fund transfers. Examples of these transfers include, but are not limited to:

☒ **Electronic check conversion.** You may authorize a merchant or other payee to make a one-time electronic payment from your checking account using information from your check to pay for purchases or pay bills. You may:

☐ Not exceed more than _____ payments by electronic check per _____ .

☐ Make payments by electronic check from _____ _____ . Payments are limited to _____ per _____ .

☒ **Electronic returned check charge.** You may authorize a merchant or other payee to initiate an electronic fund transfer to collect a charge in the event a check is returned for insufficient funds. You may:

☐ Make no more than _____ payments per _____ for electronic payment of charges for checks returned for insufficient funds.

☐ Make electronic payment of charges for checks returned for insufficient funds from _____ _____ . Payments are limited to _____ per _____ .

☐ _____
_____
_____
_____

## GENERAL LIMITATIONS

In addition to those limitations on transfers elsewhere described, if any, the following limitations apply:

☒ Transfers fr●m a <u>Money Market /Statement Say</u> account to another account or to third parties by preauthorized, automatic, or telephone transfer are limited to <u>six (6)</u> _____ with no more than <u>six (6)</u> _____ transfers by <u>check</u> _____ or similar order to third parties. If you exceed the transfer limitations set forth above in any statement period, your account will be subject to closure by the financial institution.

☒ <u>Savings accounts are limited to two (2)</u> <u>free withdrawals per month. The statement</u> <u>period used is a calendar month.</u> _____

## TEMPORARY LIMITATIONS

☐ The following services will not be available until your identity is verified. Once your identity has been verified, any limits disclosed to you will apply.

_____
_____
_____

☐ Until your identity is verified, you may make payments, transfers, or withdrawals (as applicable) using _____ of not more than _____ per _____ . Once your identity has been verified, any limits disclosed to you will apply.

☐ _____
_____

## FEES

☐ We charge _____ each _____ _____ to our customers whose accounts are set up to use _____
_____ .

☐ We charge _____ each _____ _____ but only if the _____ _____ balance in the _____ _____ falls below _____ during the _____

☒ <u>We charge $1.50 per transaction for</u> <u>withdrawals made at a non-IBERIABANK fsb</u> <u>ATM.</u>

☐ _____
_____

Except as indicated above, we do not charge for Electronic Fund Transfers.
**ATM Operator/Network Fees:** When you use an ATM not owned by us, you may be charged a fee by the ATM operator or any network used (and you may be charged a fee for a balance inquiry even if you do not complete a fund transfer).

Electronic Fund Transfers Disclosure
Bankers Systems TM
Wolters Kluwer Financial Services © 1980, 2007

Rev 07/01/2009
ETM-2-LAZ 9/23/2008

_____   Page 2 of 5

## DOCUMENTATION

**(a) Terminal Transfers.** You can get a receipt at the time you make a transfer to or from your account using a(n)

- ☒ automated teller machine
- ☒ point-of-sale terminal.
- ☒ You may not get a receipt if the amount of the transfer is $15 or less.

**(b) Preauthorized Credits.** If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you can call us at the telephone number listed below to find out whether or not the deposit has been made.

**(c) In addition,**

- ☒ You will get a monthly account statement from us, unless there are no transfers in a particular month. In any case you will get a statement at least quarterly.

- ☒ You will get a quarterly statement from us on your savings account if the only possible electronic transfer to or from the account is a preauthorized credit.

- ☐ If you bring your passbook to us, we will record any electronic deposits that were made to your account since the last time you brought in your passbook.

- ☐ _____
     _____

## PREAUTHORIZED PAYMENTS

**(a) Right to stop payment and procedure for doing so.** If you have told us in advance to make regular payments out of your account, you can stop any of these payments. Here's how:

Call or write us at the telephone number or address listed in this disclosure, in time for us to receive your request 3 business days or more before the payment is scheduled to be made. If you call, we may also require you to put your request in writing and get it to us within 14 days after you call.

☒ We charge 30.00 _____ for each stop payment.

**(b) Notice of varying amounts.** If these regular payments may vary in amount, the person you are going to pay will tell you, 10 days before each payment, when it will be made and how much it will be. (You may choose instead to get this notice only when the payment would differ by more than a certain amount from the previous payment, or when the amount would fall outside certain limits that you set.)

**(c) Liability for failure to stop payment of preauthorized transfer.** If you order us to stop one of these payments 3 business days or more before the transfer is scheduled, and we do not do so, we will be liable for your losses or damages.

## FINANCIAL INSTITUTION'S LIABILITY

**(a) Liability for failure to make transfers.** If we do not complete a transfer to or from your account on time or in the correct amount according to our agreement with you, we will be liable for your losses or damages. However, there are some exceptions. We will not be liable, for instance:

- ◆ If, through no fault of ours, you do not have enough money in your account to make the transfer.
- ◆ If the transfer would go over the credit limit on your overdraft line.
- ◆ If the automated teller machine where you are making the transfer does not have enough cash.
- ◆ If the terminal or system was not working properly and you knew about the breakdown when you started the transfer.
- ◆ If circumstances beyond our control (such as fire or flood) prevent the transfer, despite reasonable precautions that we have taken.
- ◆ There may be other exceptions stated in our agreement with you.

## CONFIDENTIALITY

We will disclose information to third parties about your account or the transfers you make:

(1) where it is necessary for completing transfers; or
(2) in order to verify the existence and condition of your account for a third party, such as a credit bureau or merchant; or
(3) in order to comply with government agency or court orders; or
(4) ☒ if you give us written permission.
- ☒ as explained in the separate Privacy Disclosure.
- ☐ _____

## UNAUTHORIZED TRANSFERS

**(a) Consumer Liability.** Tell us at once if you believe your card and/or code has been lost or stolen, or if you believe that an electronic fund transfer has been made without your permission using information from your check. Telephoning is the best way of keeping your possible losses down. You could lose all the money in your account (plus your maximum overdraft line of credit). If you tell us within 2 business days after you learn of the loss or theft of your card and/or code, you can lose no more than $50 if someone used your card and/or code without your permission. Also, if you do NOT tell us within 2 business days after you learn of the loss or theft of your card and/or code, and we can prove we could have stopped someone from using your card and/or code without your permission if you had told us, you could lose as much as $500. Also, if your statement shows transfers that you did not make, including those made by card, code or other means, tell us at once. If you do not tell us within 60 days after the statement was mailed to you, you may not get back any money you lost after the 60 days if we can prove that we could have stopped someone from taking the money if you had told us in time.

If a good reason (such as a long trip or a hospital stay) kept you from telling us, we will extend the time period.

☒ **Visa® Debit Credit.** Additional Limits on Liability for debit VISA _____.

Unless you have been grossly negligent or have engaged in fraud, you will not be liable for any unauthorized transactions using your lost or stolen Visa card. This additional limit on liability does not apply to ATM transactions or to transactions using your Personal Identification Number which are not processed by Visa. Visa is a registered trademark of Visa International Service Association.

Electronic Fund Transfers Disclosure
Bankers Systems ™
Wolters Kluwer Financial Services © 1980, 2007

Rev 07/01/2009
ETM-2-LAZ 9/23/2008

_____   Page 3 of 5

☐ **MasterCard** ® **Debit Card.** Additional limits on Liability for _____ .
You will not be liable for any unauthorized transactions using your MasterCard debit card, when used for point-of-sale transactions, if: (i) you can demonstrate that you have exercised reasonable care in safeguarding your card from the risk of loss or theft, (ii) you have not reported to us two or more incidents of unauthorized use within the prior twelve-month period, and (iii) your account is in good standing. If any of these conditions are not met, your liability is the lesser of $50 or the amount of money, property, labor, or services obtained by the unauthorized use before notification to us. "Unauthorized use" means the use of your debit card by a person, other than you, who does not have actual, implied, or apparent authority for such use, and from which you receive no benefit. This additional limit on liability does not apply to ATM transactions or to transactions using your Personal Identification Number which are not processed by MasterCard. MasterCard is a registered trademark of MasterCard International Incorporated.

☐ _____
_____
_____
_____
_____

**(b) Contact in event of unauthorized transfer.** If you believe your card and/or code has been lost or stolen, call or write us at the telephone number or address listed at the end of this disclosure. You should also call the number or write to the address listed at the end of this disclosure if you believe a transfer has been made using the information from your check without your permission.

**ERROR RESOLUTION NOTICE**
In Case of Errors or Questions About Your Electronic Transfers, Call or Write us at the telephone number or address listed below, as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer listed on the statement or receipt. We must hear from you no later than 60 days after we sent the FIRST statement on which the problem or error appeared.
  (1) Tell us your name and account number (if any).
  (2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.
  (3) Tell us the dollar amount of the suspected error.
  If you tell us orally, we may require that you send us your complaint or question in writing within 10 business days.
  We will determine whether an error occurred within 10 business days (5 business days if involving a Visa® point-of-sale transaction processed by Visa or 20 business days if the transfer involved a new account) after we hear from you and will correct any error promptly. If we need more time, however, we may take up to 45 days (90 days if the transfer involved a new account, a point-of-sale transaction, or a foreign-initiated transfer) to investigate your complaint or question. If we decide to do this, we will credit your account within 10 business days (5 business

days if involving a Visa point-of-sale transaction processed by Visa or 20 business days if the transfer involved a new account) for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your account. An account is considered a new account for 30 days after the first deposit is made, if you are a new customer.
  We will tell you the results within three business days after completing our investigation. If we decide that there was no error, we will send you a written explanation.
  You may ask for copies of the documents that we used in our investigation.

**ADDITIONAL INFORMATION:**

Electronic Fund Transfers Disclosure
Bankers Systems ™
Wolters Kluwer Financial Services © 1980, 2007

Rev 07/01/2009
ETM-2-LAZ 9/23/2008

Page 4 of 6

By signing below customer acknowle●s receipt of pages
1, 2, 3, 4 and 5 of this notice:

_____   _____
**Signed**                    **Dated**

---

**INSTITUTION** (name, address, telephone number, business days)

Business days:  Monday through Friday, excluding holidays.

IBERIABANK fsb
Pulaski Heights
5800 R St
Little Rock,AR 72207
(501) 661-7748

Electronic Fund Transfers Disclosure
Bankers Systems TM
Wolters Kluwer Financial Services © 1980, 2007



IBERIABANK fsb
Pulaski Heights
5800 R St
Little Rock,AR 72207

# TRUTH IN SAVINGS DISCLOSURE

Terms following a ☐ apply only if checked.

Acct: <u>Freedom Business Checking - Retail</u>

Acct #: <u>20000241288</u>

Date: <u>                    01/20/2010                    </u>

☐ The interest rate and annual percentage yield stated below are accurate as of the date printed above. If you would like more current rate and yield
information please call us at <u>(501) 661-7748</u>              .
This disclosure contains the rules which govern your deposit account. Unless it would be inconsistent to do so, words and phrases used in this disclosure should be construed so that the singular includes the plural and the plural includes the singular.

We reserve the right to at any time require not less than _____ days notice in writing before any withdrawal from an interest bearing account.

## ☐ FIXED RATE

☐ The interest rate for your account is _____ % with an annual percentage yield of_____ %. We will pay this rate _____
We will not decrease this rate unless we first give you at least 30 days notice in writing.

☐ The interest rate and annual percentage yield for your account depend upon the applicable rate tier. We will pay these rates _____
_____
We will not decrease these rates unless we first give you at least 30 days notice in writing.

## ☐ VARIABLE RATE

☐ The interest rate for your account is _____ % with an annual percentage yield of_____ %. Your interest rate and annual percentage yield may change.

☐ The interest rate and annual percentage yield for your account depend upon the applicable rate tier. The interest rate and annual percentage yield for these tiers may change.

### Determination of rate

☐ At our discretion, we may change the interest rate on your account.

☐ The interest rate for your account_____
_____
_____
_____ .

☐ The fixed initial rate is not determined by this rule.
☐ The initial interest rate on your account_____
_____
_____
_____
_____ .

Subsequent rates _____
_____
_____
_____

### Frequency of rate change

☐ We may change the interest rate on your account _____
_____ .

☐ Your initial interest rate will not change _____
_____ .

We may change the interest rate on your account at that time and _____ thereafter.

### Limitations on rate changes

☐ The interest rate for your account will not_____
by more than _____ each _____ .
☐ The interest rate will not be less than _____ %
or more than _____ %.
☐ The interest rate will not _____
_____
the interest rate initially disclosed to you.

### Minimum Balance Requirements

☒ *To open the account.* You must deposit at least
$ _____ to open this account.

☐ *To avoid imposition of fees.*
To avoid the imposition of the _____ you
must meet _____ following requirements:

☐ A _____ of $ _____
will be imposed every_____
if the balance in the account falls below $ _____
any day of the _____ .

☐ A _____ of $ _____
will be imposed every _____
if the average daily balance for the _____
_____ falls below $ _____ . The average daily balance is calculated by adding the principal in the account for each day of the period and dividing that figure by the number of days in the period.

The period we use is _____ .

To avoid the imposition of the_____ you
must meet _____ following requirements:

☐ A _____ of $ _____
will be imposed for_____
transaction (withdrawal, check paid, automatic transfer or payment out of your account) if the balance in the account

falls below $ _____ any day of the _____
_____ .

☐ A _____ of $ _____
will be imposed for_____
transaction (withdrawal, check paid, automatic transfer or payment out of your account) if the average daily balance for the _____ falls below
$ _____ . The average daily balance is calculated by adding the principal in the account for each day of the period and dividing that figure by the number of days in the period.

The period we use is _____ .

☐ *To obtain the annual percentage yield disclosed.*
☐ You must maintain a minimum balance of
$ _____ in the account each day to obtain the disclosed annual percentage yield.

☐ You must maintain a minimum average daily balance of
$ _____ to obtain the disclosed annual percentage yield. The average daily balance is calculated by adding the principal in the account for each day of the period and dividing that figure by the number of days in the period.

The period we use is _____

Experi © 1992 Bankers Systems, Inc., St. Cloud, MN Form TSD 8/11/2003   Rev 11/09/2009

EXHIBIT
4

**Compounding and Crediting**

☐ *Frequency* - Interest _____ be compounded_____ .

Interest will be _____

_____ .

☐ *Effect of closing an account* - If you close your account before interest is credited, you _____ receive the accrued interest.

**Balance Computation Method**

☐ *Daily Balance Method.* We use the daily balance method to calculate the interest on your account. This method applies a daily periodic rate to the principal in the account each day.

☐ *Average Daily Balance Method.* We use the average daily balance method to calculate interest on your account. This method applies a periodic rate to the average daily balance in the account for the period. The average daily balance is calculated by adding the principal in the account for each day of the period and dividing that figure by the number of days in the period.

The period we use is _____ .

**Accrual of Interest on noncash deposits**

☐ Interest begins to accrue no later than the business day we receive credit for the deposit of noncash items (for example, checks).

☐ Interest begins to accrue_____

_____

_____

_____

you deposit noncash items (for example, checks).

**Bonuses**

☐ You will _____ _____

_____

as a bonus_____ .

☐ You must maintain a minimum_____

_____ of $ _____

to obtain the bonus.

☐ To earn the bonus, _____

_____

_____

_____

**Transaction Limitations**

☐ The minimum amount you may deposit is

$_____ .

☐ The minimum amount you may withdraw is

$_____ .

☐ You may only make _____ transfers from your account

each_____ — _____ by checks to

third parties and _____

_____

The minimum withdrawal is $_____ .

☐ You may only make_____deposits into your account each statement cycle.

☐ You may only make _____ ATM _____ your account each statement cycle.

☐ You may only make _____ preauthorized transfers _____ your account each statement cycle.

**Temporary Transaction Limitations:**

☐ The following withdrawal limitations apply until your identity is verified. Once your identity has been verified, any limits disclosed to you will apply.

_____

_____

_____

☐ _____

_____

_____

**Additional Terms**

No monthly service charge.

The following fees may be assessed against your account:
*100 transaction items permitted per month at no charge.
*Transaction items over 100 = $0.35 per item.
*Coin & Currency permitted monthly is $5,000.00. If this amount is exceeded in cash items deposited or furnished with this account, the account will be converted to an Ideal Business Checking or Commercial Checking account.

Image Safekeeping required. Check images are not returned with your statement.

**Account Agreement**   Date: _____

COPY

**Institution Name & Address**

PULASKI BANK
Pulaski Heights
5800 R St
Little Rock, AR 72207

Internal Use | Checking

**IMPORTANT ACCOUNT OPENING INFORMATION:** Federal law requires us to obtain sufficient information to verify your identity. You may be asked several questions and to provide one or more forms of identification to fulfill this requirement. In some instances we may use outside sources to confirm the information. The information you provide is protected by our privacy policy and federal law.

Enter Non-Individual Owner Information on page 2. There is additional Owner/Signer Information space on page 2.

**Ownership of Account**

The specified ownership will remain the same for all accounts.
- [ ] Individual
- [X] Joint with Survivorship (not as tenants in common)
- [ ] Joint with No Survivorship (as tenants in common)
- [ ] Trust-Separate Agreement Dated: _____
- [ ] Corporation - For Profit
- [ ] Corporation - Nonprofit
- [ ] Partnership
- [ ] Sole Proprietorship
- [ ] Limited Liability Company
- [ ]

**Beneficiary Designation**

*(Check appropriate ownership above.)*
- [X] Pay-On-Death (POD)
- [ ]

**Beneficiary Name(s), Address(es), and SSN(s)**

*(Check appropriate beneficiary designation above.)*

**Owner Signer Information 1**

| | |
|---|---|
| Name | |
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

- [ ] If checked, this is a temporary account agreement.

Number of signatures required for withdrawal: **One   (1)** .

**Signature(s)**

The undersigned authorize the financial institution to investigate credit and employment history and obtain reports from consumer reporting agency(ies) on them as individuals. Except as otherwise provided by law or other documents, each of the undersigned is authorized to make withdrawals from the account(s), provided the required number of signatures indicated above is satisfied. The undersigned personally and as, or on behalf of, the account owner(s) agree to the terms of, and acknowledge receipt of copy(ies) of, this document and the following:

- [X] Terms and Conditions
- [X] Electronic Fund Transfers
- [X] Substitute Checks
- [ ] Common Features
- [X] Privacy
- [X] Truth in Savings
- [X] Funds Availability
- [ ] _____

- [ ] Agency Designation (See Owner/Signer Information for Agency designation(s).)

Agency designation *(select and initial):* [ ] Survives OR
- [ ] Terminates on disability or incapacity of parties.

**Owner Signer Information 2**

| | |
|---|---|
| Name | |
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

]
]
[                              ] 4[x                              ]

EXHIBIT

5

## Owner-Signer Information 3

| | |
|---|---|
| Name | |
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

## Owner-Signer Information 4

| | |
|---|---|
| Name | |
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E-Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov't Issued Photo ID (Type, Number, State, Issue Date, Exp. Date) | |
| Other ID (Description, Details) | |
| Employer | |
| Previous Financial Inst. | |

## Backup Withholding Certifications

**(If not a "U.S. Person," certify foreign status separately.)**

TIN:

☒ **Taxpayer I.D. Number (TIN)** - The number shown above is my correct taxpayer identification number.

☒ **Backup Withholding** - I am not subject to backup withholding either because I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me that I am no longer subject to backup withholding.

☐ **Exempt Recipients** - I am an exempt recipient under the Internal Revenue Service Regulations.

I certify under penalties of perjury the statements checked in this section and that I am a U.S. person (including a U.S. resident alien).

X _____ (Date)

## Non-Individual Owner Information

| | |
|---|---|
| Name | |
| EIN | |
| Phone | |
| Mobile Phone | |
| E-Mail | |
| Type of Entity | |
| State/Country & Date of Organization | |
| Nature of Business | |
| Address | |
| Mailing Address (if different) | |
| Authorization/ Resolution Date | |
| Previous Financial Inst. | |

## Account Description / Account 2          Initial Deposit Source

| | | |
|---|---|---|
| | | ☐ Cash  ☐ Check ☐ _____ |
| | | ☐ Cash  ☐ Check ☐ _____ |

## Services Requested

☐ ATM   ☐ Debit/Check Cards (No. Requested: _____)
☐ _____
☐ _____

## Other Terms/Information

Form No. PL 06223 LR

# ❋ PULASKI BANK



Dear Valued Client,

In an effort to provide exceptional service, we will automatically provide you with an optional overdraft service, called "Bounce Protection Privilege" (referred to as Bounce) for your personal checking account. Beginning 5/01/07 your Bounce limit will be $500.00. Bounce is a discretionary overdraft service and Pulaski Bank reserves the right to pay or not pay inadvertent overdrafts created by checks, in-person withdrawals, ATM withdrawals, or other electronic means.

We may honor those unplanned overdrafts up to the Bounce limit on your account as long as you maintain your account in good standing (defined as making regular deposits, bringing your account to a positive balance at least once every 30 days, and not having excessive overdrafts). You should make every attempt to bring your account to a a positive balance as quickly as possible. If after 60 days, your account has not been brought to a positive balance, we will have no option but to close your account and take steps to the recover funds. A $30 Paid Item fee is charged to your account for each overdraft transaction These fees will reduce your available Bounce limit.

Pulaski Bank will notify you by mail when an overdraft occurs. If you exceed the established Bounce limit or if we exercise our discretion concerning the handling of your account, we may return transactions to the payee. In that case, the normal Return Item fee of $30 per item will be charged. No interest will be charged on your overdraft balance. We encourage responsible use of the Bounce service.

For more detailed information about Bounce, we encourage you to review your Deposit Agreement and Bounce Protection brochure given to you when the account was opened. If you do not want the Bounce service or would like more information about the service, please call Customer Service at 800-264-7814 or visit any of our convenient branch locations.

We appreciate your business and look forward to continuing to serve your banking needs.

Sincerely,

Don Ledet
Executive Vice-President

BP2310P

EXHIBIT

6

 **IBERIABANK** *fsb*
P O Box 7299
Little Rock AR 72217-7299

12/22/09



## BOUNCE PROTECTION NOTICE

The items listed below were presented for payment on December 22, 2009 and paid under the Bounce Protection® Privilege overdraft service:

| Check number | Amount | Check number | Amount |
|---|---|---|---|
| | 183.35 | | 60.48 |

Your checking account has been charged $60.00 for paying these items on your behalf.

Checking account number..: ■■■■■■
Current balance..........: $260.18-

We appreciate your business and look forward to continuing to serve your banking needs.

**EXHIBIT**

**7**

**Member
FDIC**

Balance at end of day on Friday, May 28, 2010:                    $1329.55

Saturday May 29, 2010 – Monday, May 31, 2010 (Memorial Day)

| Company | Debit Amount | Balance |
|---|---|---|
| Suds 6/1 | ($6.00) | $1323.55 |
| Subway 6/1 | ($6.02) | $1317.53 |
| Coldstone 6/1 | ($7.33) | $1310.20 |
| Subway 5/30 | ($7.98) | $1302.22 |
| Tropical Smooth 6/1 | ($8.28) | $1293.94 |
| Coldstone 5/30 | ($8.63) | $1285.31 |
| Books and Bruins 5/29 | ($11.24) | $1274.07 |
| Popeye's 6/1 | ($12.88) | $1261.19 |
| Kmart 6/1 | ($14.13) | $1247.06 |
| ExxonMobil 5/31 | ($19.99) | $1227.07 |
| Walgreen 5/30 | ($20.36) | $1206.71 |
| Wal Mart 5/29 | ($21.92) | $1184.79 |
| Walgreen 6/1 | ($22.98) | $1161.81 |
| CNS Academy 5/29 | ($26.83) | $1134.98 |
| CheeburgerCheeburger 5/30 | ($40.32) | $1094.66 |
| Shell 5/29 | ($41.80) | $1052.86 |
| Barnes and Noble 5/30 | ($50.28) | $1002.58 |
| Kmart 5/29 | ($60.35) | $942.23 |
| Sekisui 5/31 | ($68.83) | $873.40 |
| Loca Luna 5/31 | ($73.58) | $799.82 |
| Macaroni Grill 5/30 | ($76.97) | $722.85 |
| TLF Search Flo 5/29 | ($81.00) | $641.85 |
| Check 6085 6/1 | ($90.30) | $551.55 |
| Check 6084 6/1 | ($90.30) | $461.25 |
| Bill pay from checking 5/29 | ($93.88) | $367.37 |
| Gander Mtn 5/30 | ($105.96) | $261.41 |
| Best Buy 5/29 | ($112.64) | $148.77 |
| Target 5/29 | ($177.15) | -$28.38 |
| NSF CHARGE | ($30.00) | -$58.38 |

EXHIBIT

8

Balance at end of day on Friday, May 28, 2010:                    $1329.55


Saturday May 29, 2010 – Monday, May 31, 2010 (Memorial Day)


| Company | Debit Amount | Balance |
|---|---|---|
| Target 5/29 | ($177.15) | $1152.40 |
| Best Buy 5/29 | ($112.64) | $1039.76 |
| Gander Mtn 5/30 | ($105.96) | $933.80 |
| Bill pay from checking 5/29 | ($93.88) | $839.92 |
| Check 6084 6/1 | ($90.30) | $749.62 |
| Check 6085 6/1 | ($90.30) | $659.32 |
| TLF Search Flo 5/29 | ($81.00) | $578.32 |
| Macaroni Grill 5/30 | ($76.97) | $501.35 |
| Loca Luna 5/31 | ($73.58) | $427.77 |
| Sekisui 5/31 | ($68.83) | $358.94 |
| Kmart 5/29 | ($60.35) | $298.59 |
| Barnes and Noble 5/30 | ($50.28) | $248.31 |
| Shell 5/29 | ($41.80) | $206.51 |
| CheeburgerCheeburger 5/30 | ($40.32) | $166.19 |
| CNS Academy 5/29 | ($26.83) | $139.36 |
| Walgreen 6/1 | ($22.98) | $116.38 |
| Wal Mart 5/29 | ($21.92) | $94.46 |
| Walgreen 5/30 | ($20.36) | $74.10 |
| ExxonMobil 5/31 | ($19.99) | $54.11 |
| Kmart 6/1 | ($14.13) | $39.98 |
| Popeye's 6/1 | ($12.88) | $27.10 |
| Books and Bruins 5/29 | ($11.24) | $15.86 |
| Coldstone 5/30 | ($8.63) | $7.23 |
| Tropical Smooth 6/1 | ($8.28) | -$1.05 |
| NSF CHARGE | ($30.00) | -$31.05 |
| Subway 5/30 | ($7.98) | -$39.03 |
| NSF CHARGE | ($30.00) | -$69.03 |
| Coldstone 6/1 | ($7.33) | -$76.36 |
| NSF CHARGE | ($30.00) | -$106.36 |
| Subway 6/1 | ($6.02) | -$112.38 |
| NSF CHARGE | ($30.00) | -$142.38 |
| Suds 6/1 | ($6.00) | -$148.38 |
| NSF CHARGE | ($30.00) | -$178.38 |

EXHIBIT

9

Multiple claims. If a complaint asserts multiple claims which involve different subject matter divisions of the
circuit court, the cover sheet for that division which is most definitive of the nature of the case should be
selected and completed.

**COVER SHEET**
**STATE OF ARKANSAS**
**CIRCUIT COURT: CIVIL**



To Save a copy of this form to your
computer, please click the disk icon
on the toolbar above.

The civil reporting form and the information contained herein shall not be admissible as evidence in any court proceeding
or replace or supplement the filing and service of pleadings, orders, or other papers as required by law or Supreme Court
Rule. This form is required pursuant to Administrative Order Number 8. Instructions are located on the back of the form.

**FILING INFORMATION**

County: _Pulaski_    District: _____    Docket Number: 60 CV -11- 770

Judge: _Moody_    Division: 3rd    Filing Date: FEB 18 2011

Plaintiff: _David S. Sachar   Christine M. Sachar_    Defendant: _IBERIA BANC CORPORATION_

Attorney Providing Information: _Jack Wagoner III_    _1320 Brookwood, Suites D + E_
☒ Plaintiff   ☐ Defendant   ☐ Intervenor    Address
    _Little Rock, AR 72202_

Litigant, If Pro Se: _____    Address
    Case Number(s) _____

Related Case(s): Judge_____

**Type of Case:**

*Torts*
☐ (NM) Negligence: Motor Vehicle
☐ (NO) Negligence: Other
☐ (BF) Bad Faith
☐ (FR) Fraud
☐ (MP) Malpractice
☐ (PL) Product Liability
☐ (OD) Other _____

*Contracts*
☐ (IS) Insurance
☐ (DO) Debt: Open Account
☐ (PN) Debt: Promissory Note
☐ (EM) Employment
☐ (OC) Other _____

*Equity*
☐ (FC) Foreclosure
☐ (QT) Quiet Title
☐ (IJ) Injunction
☐ (PT) Partition
☐ (OT) Other _____

*Miscellaneous*
☐ (CD) Condemnation
☐ (RE) Replevin
☐ (DJ) Declaratory Judgment
☐ (UD) Unlawful Detainer
☐ (IN) Incorporation
☐ (EL) Election
☐ (FJ) Foreign Judgment
☐ (WT) Writs_____
☐ (AA) Administrative Appeal
☐ (CF) Property Forfeiture
☐ (RD) Remove Disabilities
☐ (NC) Name Change
☒ (OM) Other _Class Action_

Jury Trial Requested: ☒ Yes   ☐ No    Manner of Filing: ☒ Original ☐ Re-open ☐ Transfer
    ☐ Return from Federal/Bankruptcy Court

**DISPOSITION INFORMATION**

Disposition Date: _____    ☐ Bench Trial    ☐ Non-Trial   ☐ Jury Trial

**Judgment Type:**
☐ (DJ) Default Judgment
☐ (SJ) Summary Judgment
☐ (CJ) Consent Judgment
☐ (TJ) Trial Judgment
☐ (OJ) Other Judgment
☐ (PG) Petition Granted
☐ (PD) Petition Denied
☐ (DF) Decree of Foreclosure

**Dismissal Type:**
☐ (DW) Dismissed with Prejudice
☐ (DN) Dismissed without
    Prejudice

**Other:**
☐ (TR) Transferred to Another
    Jurisdiction
☐ (RB) Removed to Bankruptcy Court
☐ (RF) Removed to Federal Court
☐ (AR) Arbitration

**Judgment For:**
☐ Plaintiff   ☐ Defendant   ☐ Both    Judgment Amount: $ _____

Clerk's Signature
AOC 23  10-01
625 Marshall Street
Little Rock, AR 72201

Date _____

Send 1 paper or electronic copy to AOC upon filing.
Send 1 paper or electronic copy to AOC upon disposition.
Keep original in court file.

**Effective 1-1-2002**

IN THE CIRCUIT COURT FOR PULASKI COUNTY, ARKANSAS
3RD DIVISION

DAVID J. SACHAR, and CHRISTINE
M. SACHAR, individually and on
behalf of all others similarly situated,                     CASE NO:  60-CV2011 0770

      Plaintiff,                                               CLASS REPRESENTATION

v.

IBERIABANK CORPORATION,

      Defendants.
_____/

### NOTICE OF FILING NOTICE OF REMOVAL OF CIVIL ACTION

To:  Larry Crane
     Pulaski County Circuit Clerk
     401 West Markham Street
     Little Rock, Arkansas  72201

You are hereby notified that Defendant IberiaBank Corporation, an Louisiana Corporation

("IberiaBank"), has on the 24th day of March, 2011, filed in the United States District Court for

the Eastern District of Arkansas, a Notice of Removal to Federal Court of the above-entitled

cause, a copy of which is attached hereto and made a part of the Notice to Clerk, for your

information and guidance.  This Notice serves to effect full removal of this case pursuant to 28

U.S.C. § 1446(d), thereby precluding this state court from proceeding further in this case, unless

and until this case is remanded hereto by the United States District Court.



18476093.1

Respectfully Submitted,

Elizabeth Robben Murray, Ark. Bar #79244
Kevin A. Crass, Ark. Bar #84029
FRIDAY, ELDREDGE & CLARK, LLP
400 W. Capitol Avenue, *Suite 2000*
Little Rock, Arkansas 72201
Telephone:  (501) 376-2011
Facsimile:  (501) 244-5356
E-mail: Murray@fridayfirm.com
E-mail:  Crass@fridayfirm.com

Attorneys for Defendant IBERIABANK
Corporation

By: _Elizabeth Robben Murray_
    Elizabeth Robben Murray

## CERTIFICATE OF SERVICE

**I, Elizabeth Robben Murray, hereby certify** that on this 24th day of March, 2011, a

copy of this notice was mailed to:

Jack Wagoner
Wagoner law Firm, P.A.
1320 Brookwood, Suite E
Little Rock, AR 72202

Brent Walker
Carter Walker, PLLC
P.O. Box 629
Cabot, AR 72023

Steven A. Owings
Owings Law Firm
1400 Brookwood
Little Rock, AR 72202

By: _Elizabeth Robben Murray_
Elizabeth Robben Murray

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 2 4 2011

JAMES W. McCORMACK, CLERK
By: _____
                    DEP CLERK

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**

DAVID J. SACHAR, and CHRISTINE          )
M. SACHAR, as individuals and on        )     CIVIL ACTION NO. 4·11-CV-0266 BSM
behalf of all others similarly situated, )
                                         )     State Case No. 60 cv 2011 0770
              Plaintiffs,                )
                                         )
v.                                       )
                                         )
IBERIABANK CORPORATION,                  )
                                         )
              Defendants.                )

---

**STATE OF LOUISIANA**
**PARISH OF LAFAYETTE**

**DECLARATION OF DON P. LEDET**

Comes Don P. Ledet and for his Declaration states the following under penalty of perjury:

1.     My name is Don P. Ledet, and I am an Executive Vice President and the Director of Deposit Products and Retail Support for IBERIABANK Corporation, a Louisiana state chartered bank with its principal place of business in the city of Lafayette, in Lafayette Parish, Louisiana.

2.     I am over the age of 18 years and competent to make this declaration.

3.     I make this Declaration in support of Defendant, IBERIABANK Corporation's ("IBERIABANK Corp.") Notice of Removal, filed pursuant to 28 U.S.C. §§ 1331, 1332, 1441, and 1446, in the above-captioned case, which is presently pending in the Circuit Court in and for


EXHIBIT
C

Pulaski County, Arkansas, and removed by the Notice to the United States District Court for the Eastern District of Arkansas.

4.     I have been employed by IBERIABANK Corp. since 1996, and am authorized to execute this Declaration on its behalf.

5.     As Executive Vice President and Director of Deposit Products and Retail Support, I am familiar with IBERIABANK Corp.'s business operations regarding its overdraft charges and policies.

## Relevant Corporate History of IBERIABANK Corp.

6.     As part of my job, I am generally familiar with the various banks and thrifts that IBERIABANK Corp. has acquired over the last several years, and I have reviewed various merger documents and related documents to assist with my understanding of these issues.

7.     IBERIABANK Corp. is a Louisiana corporation with its principal place of business based in Louisiana.   *See* true and correct print-out of IBERIABANK Corp.'s registration statement from the website of the Louisiana Secretary of State, attached hereto as Exhibit 1.

8.     As of the date of this declaration, IBERIABANK Corp. can be most accurately characterized as the bank holding company for IBERIABANK—a 124-year old banking corporation based in Louisiana, with branches in Alabama, Arkansas, Florida, Tennessee and Texas.

9.     IBERIABANK is a state-chartered bank, chartered under the laws of the state of Louisiana and a member of the Federal Reserve System.

10.     In that regard, the Board of Governors of the Federal Reserve System is the primary federal regulator for IBERIABANK.

2

11.     While it previously had a small number of customers in Arkansas whose accounts were held by IBERIABANK (the Louisiana state-chartered bank), IBERIABANK Corp. first formally entered the Arkansas market in early 2007.

12.     Specifically, on or about January 31, 2007, IBERIABANK Corp. acquired Pulaski Investment Corporation, the holding company for Pulaski Bank and Trust Company of Little Rock, Arkansas ("PBT") by merger.  PBT was a state-chartered bank, chartered under the laws of the state of Arkansas.

13.     On or about February 1, 2007, IBERIABANK Corp. acquired Pocahontas Bancorp, Inc., the holding company for First Community Bank of Jonesboro, Arkansas ("FCB"), by merger.  FCB was a federally chartered savings institution (a/k/a an "S & L" or a "thrift") pursuant to 12 U.S.C. § 1461, *et seq.*  As such, FCB was under the supervision of the United States Department of Treasury, Office of Thrift Supervision (the "OTS") as its primary regulator.

14.     Subsequent to the consummation of these two acquisitions, IBERIABANK Corp. merged the PBT with and into FCB, the surviving institution in the merger.

15.     The OTS approved the merger effective April 22, 2007.  In connection with the merger, the surviving institution, FCB (the thrift), changed its name to the Pulaski Bank and Trust Company ("Pulaski").

16.     Effective April 22, 2007, Pulaski was a thrift under the supervision of the OTS, comprised of the former customers of FCB and PBT, and was a wholly owned subsidiary of IBERIABANK Corp.

17.     On May 9, 2008, ANB Financial, National Association, Bentonville, Arkansas ("ANB")—a national bank based in Arkansas—was closed by the Office of the Comptroller of the Currency, and the Federal Deposit Insurance Corporation (FDIC) was named receiver.  That

same day, the FDIC's Board of Directors approved the assumption of the insured deposits of ANB Financial by Pulaski. In addition to assuming ANB's insured deposits, Pulaski purchased approximately $235.9 million of ANB's assets. The assets comprised certain of ANB's assets and were comprised mainly of cash, cash equivalents and securities.

18.     IBERIABANK Corp.'s operations in Arkansas were conducted as Pulaski Bank and Trust through May 4, 2009. On May 4, 2009, Pulaski Bank and Trust was renamed "IBERIABANK*fsb*." This was a change in name only; IBERIABANK*fsb* continued to operate as a thrift under the supervision of the OTS.

19.     On December 31, 2010, IBERIABANK Corp. merged the charter and operations of IBERIABANK*fsb* (the thrift based in Arkansas) into the charter of IBERIABANK (the state-chartered bank based in Louisiana). In connection with this merger, the entity that emerged was IBERIABANK, a Louisiana state-chartered banking corporation, which is the wholly owned subsidiary of IBERIABANK Corp. This entity, IBERIABANK, now includes all of the former IBERIABANK*fsb* accounts, including all of the legacy PBT, FCB, Pulaski and ANB customer accounts.

### The Sachars' Complaint

20.     I have reviewed the Complaint filed by Plaintiffs David J. Sachar, and Christine M. Sachar, as individuals and on behalf of all others similarly situated, (the "Sachars") in the above-captioned matter and I understand that the Complaint alleges that IBERIABANK resequenced "the order in which account transactions are processed – so as to exponentially increase the amount of overdraft fees Iberia charged customers with overdraft protection coverage." Complaint, ¶ 10.

21.     I further understand that this lawsuit is filed as a class action on behalf of a putative class consisting of "all Iberia customers who maintained checking accounts with an Arkansas branch office at any point between January 31, 2007 and the time of trial who incurred one or more overdraft fees as a result of Iberia's practice of resequencing checking account transactions from highest to lowest." Complaint, ¶ 92.

22.     The Complaint seeks damages for alleged violations of the Arkansas Deceptive Trade Practices Act, breach of contract, unjust enrichment and conversion, as well as injunctive relief.

23.     Among other things, the Complaint alleges that IBERIABANK Corp. received "benefits from the imposition of overdraft fees" that it should not be permitted to retain. Complaint, ¶ 133.

### IBERIABANK's Overdraft Charges for Arkansas Customers

24.     In connection with this declaration, I was asked to review the total amount of non-sufficient funds charges (a/k/a "Overdraft Charges") that IBERIABANK Corp. subsidiaries collected from Arkansas customers from the period of January 2007 through the end of 2010.

25.     As set forth above IBERIABANK Corp. has acquired and/or assumed the assets and deposits of several banks in Arkansas since 2007—PBT, FCB and ANB.

26.     For the purpose of this declaration, however, I have only reviewed—and am only attesting to—data relating to Overdraft Charges charged to Arkansas customers once that bank became part of the IBERIABANK Corp. family.

27.     IBERIABANK Corp., through its subsidiaries in Arkansas, received a total of $20,371,694.06 in net revenue from Overdraft Charges from the beginning of 2007 through the end of 2010.

28.     The Complaint alleges that "Iberia engaged in a practice of resequencing transactions in its customers' accounts in high-to-low order — posting the largest transactions first and the smallest transactions last." Complaint, ¶ 2.

29.     The Complaint further describes five transactions the Sachars engaged in between May 29, 2010 and June 1, 2010 and alleged that IBERIABANK Corp. "ranking the transactions from highest to lowest results in five $30 overdraft fees." Complaint, ¶ 80. The Sachars are thus alleging that they were charged $150 in Overdraft Charges for these five transactions.

30.     The Complaint further alleges that "Iberia's high-to-low posting scheme caused the Sachars in excess of $120 in excess overdraft fees-on the one occasion noted alone." Complaint, ¶ 82.

31.     In other words, the Sachars allege that had IBERIABANK posted transactions in low-to-high order, Overdraft Charges would have been reduced by 80 percent.

32.     The Sachars further allege that their "claims are typical of the claims of other members of the proposed Class." Complaint, ¶ 102.

33.     Though IBERIABANK Corp. disputes any and all liability for the claims alleged in the Complaint, and is confident that its application of overdraft charges on a high-to-low basis has been in the best interest of its customers, based on the *Sachars' own* allegations and the Overdraft Charges data collected by IBERIABANK Corp. for Arkansas accounts, the amount in controversy in this action exceeds $5 million.

34.     Specifically, accepting—for the limited purpose of the Notice of Removal to establish the amount in controversy—the Sachars' proffer that 80% of the Overdraft Charges that IBERIABANK Corp.'s collected from its Arkansas customers improperly assessed, at least $16,297,355.01 is in controversy.  This figure represents 80% of the Overdraft Charges that

IBERIABANK Corp. collected from its customers with Arkansas-based accounts from 2007 through 2010

35.     I, Don P. Ledet, declare under penalty of perjury and under the laws of the United States of America and 28 U.S.C. § 1746 that I have read the foregoing declaration and that the facts stated herein are true and correct.


Executed on this 23 day of March, 2011.

                                                    _____
                                                    Don P. Ledet

7



<table>
<tr><td>**Tom Schedler**<br>**Secretary of State**</td><td>**State of Louisiana**<br>**Secretary of State**</td><td>**COMMERCIAL DIVISION**<br>**225.925.4704**<br><br>_Fax Numbers_<br>225.932.5317 (Admin. Services)<br>225.932.5314 (Corporations)<br>225.932.5318 (UCC)</td></tr>
</table>

| Name | Type | City | Status |
|------|------|------|--------|
| IBERIABANK CORPORATION | Business Corporation | LAFAYETTE | Active |

**Previous Names**

    ISB FINANCIAL CORPORATION (Changed: 5/8/2000)

| | |
|---|---|
| **Business:** | IBERIABANK CORPORATION |
| **Charter Number:** | 34478681 D |
| **Registration Date:** | 11/21/1994 |
| **State Of Origin:** | |

**Domicile Address**

    200 WEST CONGRESS ST.

    LAFAYETTE, LA 70501

**Mailing Address**

    C/O DARYL G. BYRD

    200 WEST CONGRESS ST.

    LAFAYETTE, LA 70501

## Status

| | |
|---|---|
| **Status:** | **Active** |
| **Annual Report Status:** | **In Good Standing** |
| **File Date:** | 11/21/1994 |
| **Last Report Filed:** | 11/8/2010 |
| **Type:** | Business Corporation |

## Registered Agent(s)

| | |
|---|---|
| **Agent:** | C T CORPORATION SYSTEM |
| **Address 1:** | 5615 CORPORATE BLVD., STE. 400B |
| **City, State, Zip:** | BATON ROUGE, LA 70808 |
| **Appointment Date:** | 5/10/2010 |

## Officer(s)                                                 Additional Officers: No

| | |
|---|---|
| **Officer:** | DARYL G. BYRD |
| **Title:** | President, Officer |
| **Address 1:** | 200 W. CONGRESS ST. |
| **City, State, Zip:** | LAFAYETTE, LA 70501 |

| | |
|---|---|
| **Officer:** | ANTHONY RESTEL |
| **Title:** | Treasurer |
| **Address 1:** | 601 POYDRAS ST., STE. 2075 |
| **City, State, Zip:** | NEW ORLEANS, LA 70130 |

| | |
|---|---|
| **Officer:** | GEORGE J. BECKER, III |
| **Title:** | Secretary |



| Address 1: | 200 WEST CONGRESS ST. |
|---|---|
| City, State, Zip: | LAFAYETTE, LA 70501 |

## Mergers (6)

| Filed Date | Effective Date: | Type | Charter# | Chater Name | Role |
|---|---|---|---|---|---|
| **5/3/1996** | **5/3/1996** | **MERGE** | **34478681D** | **IBERIABANK CORPORATION** | **SURVIVOR** |
| | | | 34454803D | ROYAL BANKGROUP OF ACADIANA, INC. | NON-SURVIVOR |
| **10/18/1996** | **10/18/1996** | **MERGE** | **34478681D** | **IBERIABANK CORPORATION** | **SURVIVOR** |
| | | | 34459675D | JEFFERSON BANCORP, INC. | NON-SURVIVOR |
| **2/28/2003** | **2/28/2003** | **MERGE** | **34478681D** | **IBERIABANK CORPORATION** | **SURVIVOR** |
| | | | 35346135D | IBERIABANK ACQUISITION CORPORATION | NON-SURVIVOR |
| **1/31/2005** | **1/31/2005** | **MERGE** | **34478681D** | **IBERIABANK CORPORATION** | **SURVIVOR** |
| | | | 34602118D | AMERICAN HORIZONS BANCORP, INC. | NON-SURVIVOR |
| **1/31/2007** | **1/31/2007** | **MERGE** | **34478681D** | **IBERIABANK CORPORATION** | **SURVIVOR** |
| **2/1/2007** | **2/1/2007** | **MERGE** | **34478681D** | **IBERIABANK CORPORATION** | **SURVIVOR** |

## Amendments on File (12)

| Description | Date |
|---|---|
| Domicile, Agent Change or Resign of Agent | 3/13/1995 |
| Merger | 5/3/1996 |
| Merger | 10/18/1996 |
| Name Change | 5/8/2000 |
| Merger | 2/28/2003 |
| Domicile, Agent Change or Resign of Agent | 5/16/2003 |
| Merger | 1/31/2005 |
| Merger | 1/31/2007 |
| Merger | 2/1/2007 |
| Amendment | 12/4/2008 |
| Amendment | 8/31/2009 |
| Domicile, Agent Change or Resign of Agent | 5/10/2010 |

Print